**ALEXIS LICHINE & CIE., Plaintiff,**

v.

**SACHA A. LICHINE ESTATE SE-LECTIONS, LTD. and Sacha Lichine, Defendants.**

Civ. A. No. 84–2415–WJS.

United States District Court,
D. Massachusetts.

June 8, 1994.

Charles Hieken, Fish & Richardson, Boston, MA, Robert M. Kunstadt, Jonathan E. Moskin, Pennie & Edmonds, New York City, for plaintiff.

Charles N. Mayburck, New York City, Patricia G. Curtin, Alan Hoffman, Lynch Brewer Hoffman, Boston, MA, Robert J. Hausen, Ghadbourne & Parke, New York City, for defendants.

*MEMORANDUM AND ORDER ON OBJECTIONS OF REPORT OF MAGISTRATE JUDGE.*

SKINNER, Senior District Judge.

In the above-entitled matter both parties object to a report and recommendation of the magistrate judge denying the defendant's motion to modify an injunction. The only significant objections are those filed by the defendant.

The defendant raises two issues:

(1) that the magistrate judge made a material mistake of fact in concluding that the witness Aaron had testified that the use of the defendant of his own name would not be "important," but Mr. Aaron in fact testified that it would not be "important" in the retail wine business, but that it would be "important" in the defendant's importing and wholesale business; and

(2) that the magistrate judge failed to appreciate that the Supreme Court in *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) liberalized the stringent requirements of a "clear showing of a grievous wrong evoked by new and unforeseen conditions" established by *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932).

Upon consideration of the excerpt from the transcript, it is my opinion that the magistrate judge did, in fact, misunderstand Mr. Aaron's testimony. In my opinion, the fact that the use of the defendant's name is "important" to him is not enough to warrant modification of the injunction in this case. Prevailing in a dispute is practically always "important" to the parties involved.

Even assuming that *Rufo* has liberalized the standards for the modification of decrees as argued by the defendant, there is still a valid public policy in favor of the finality of dispute resolutions. In my opinion, the defendant has not offered sufficient reason to overturn that policy.

Accordingly, the objections of both parties to the magistrate judge's report and recommendation are **overruled.** I adopt the recommendation of the magistrate judge. The defendant's motion to modify the injunction is **denied.** Final judgment shall enter accordingly.

*REPORT AND RECOMMENDATION RE: SACHA LICHINE'S MOTION FOR LEAVE TO INTERVENE AND TO MODIFY AN INJUNCTION (DOCKET ENTRY # 39)*

April 11, 1994

BOWLER, United States Magistrate Judge.

On August 16, 1991, defendant Sacha Lichine ("Sacha Lichine") filed a motion seeking leave to intervene and to modify the injunction entered by the district judge on April 28, 1986. (Docket Entry # 39). On April 1, 1992, the district judge allowed the motion to intervene. (Docket Entry # 49). As to modifying the injunction, the district judge found the facts disputed thereby necessitating an evidentiary hearing. (Docket Entry # 49).

On April 13, 1993, the district judge referred this case to the undersigned for a report and recommendation concerning the motion to modify the injunction. (Docket Entry # 47). On July 1, 1993, the district judge additionally referred a motion in limine (Docket Entry # 45) filed by plaintiff Alexis Lichine & Cie. ("ALC"), a motion for leave to file an amended complaint (Docket Entry # 50) and a motion to disqualify (Docket Entry # 52). After issuing a ruling on the above three motions (Docket Entry # 63), on January 18 through 21, 1994, this court held an evidentiary hearing on the motion to modify the injunction. On February 14, 1994, the parties submitted post hearing memoranda. (Docket Entry ## 74 & 76). The motion to modify (Docket Entry # 39) is therefore ripe for review.

Before summarizing the relevant testimony, it is important to recognize that modifying an injunction entered and agreed to by the parties in 1986 involves a limited inquiry. As explained in greater detail *infra,* Sacha Lichine bears the burden of establishing a "clear showing of grievous wrong evoked by new and unforeseen conditions." *United States v. Swift,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). He primarily argues that changed factual circumstances justify modifying the injunction to permit him to use his given name in script on better quality wines selling in the United States in the range of $15 to $100. (Tr. 18, pp. 107–109; Ex. N).

The April 1986 injunction[1] permanently enjoins and restrains Sacha Lichine from

---

1. On October 16, 1985, the district judge entered a Final Judgment and Injunction after issuing a Memorandum and Order in June 1985 allowing ALC's motion for partial summary judgment on the issue of liability with respect to infringement. (Docket Entry # 37). The Memorandum and

Order includes the finding that "plaintiff's mark is strong, and the evidence warrants the inference that the defendant intended to ride the coattails of the plaintiff's reputation." On April 28, 1986, the district judge issued a Modified Final Judgment and Injunction, consented to as

using the name Alexis Lichine or any colorable limitation, including, without limitation, Sacha A. Lichine and Sacha Lichine, in connection with the sale, importation, brokerage, distribution or advertising of alcoholic beverages in the United States and abroad, absent the express written consent of ALC. ALC is the owner of United States Trademark Registration No. 770,062 Alexis Lichine. (Ex. B).

As alleged by Sacha Lichine, the changed circumstances are: (1) the June 1989 death of Alexis Lichine, Sacha Lichine's father; (2) Sacha Lichine's rise in the wine industry, including his ownership of S.A. de Château Prieuré–Lichine, a French corporation which owns the United States trademark Château Prieuré–Lichine and the Château Prieuré–Lichine in Bordeaux, France; and (3) the declining reputation of ALC and Alexis Lichine wines in the United States. (Docket Entry ## 30 & 76). Sacha Lichine contends that the changed circumstances undermine the basis for the April 1986 injunction and render its continued application inequitable. He also submits that he controls the senior of the two marks. (Docket Entry # 76).

*FACTS*

I. *Preliminary History*

In 1951, Alexis Lichine purchased the Château Prieuré–Cantenac and in 1952 or 1953 changed its name to the Château Prieuré–Lichine. The property is located in the Haut–Médoc district of France near Bordeaux in the village of Cantenac. In 1955 the wines produced on the property became entitled to the place name Margaux. Cantenac is one of five villages which make up the appellation of Margaux. (Tr. 18, pp. 44–46; Ex. R, p. 404 & back leaf).

Also in 1955, Alexis Lichine founded his own company, ALC. In May 1964, ALC

registered the mark Alexis Lichine with the United States Patent Office. The first use noted in the registration is October 25, 1955. Before incorporating ALC, however, Alexis Lichine operated Alexis Lichine Selections in an unincorporated manner, bringing wines into the United States in 1946, 1947 and 1948 under that label. As of 1980, he had been in the wine business on "both sides of the Atlantic" for approximately 40 years. (Tr. 21, pp. 40–46; Ex. B & Ex. R, back leaf; Docket Entry # 37).

In July 1964, S.A. de Château Prieuré–Lichine registered the mark Château Prieuré–Lichine with the United States Patent Office. The first use noted in the registration is December 10, 1954. In or around October 1964, Alexis Lichine sold his interest in ALC, including ALC's ownership of the Alexis Lichine mark to a company affiliated with Bass Charrington.[2] Alexis Lichine retained the Château Prieuré–Lichine mark as well as the Château Prieuré–Lichine.[3] (Tr. 18, pp. 36 & 60; Ex. A; Docket Entry # 37).

II. *Sacha Lichine, His Reputation and The Château*

Sacha Lichine, an American citizen, was born in August 1960. He spent his childhood in Bordeaux as well as in New York. During his childhood, his father taught him how to produce and how to taste wine. As a child, he also worked in lines bottling wine or assisted with work in the vineyards. (Tr. 18, pp. 36–39).

He studied at Boston University. While in Boston, he worked as a wine steward in a Boston restaurant and as a consultant for C. Pappas & Company ("Pappas"), a now defunct company. He traveled throughout France assisting Pappas in selecting wine. Thereafter, he began his own wine brokerage company, Sacha A. Lichine Estate Selections ("SLES"), named as a defendant in this suit.

---

to form by ALC and defendant Sacha A. Lichine Estate Selections, Ltd., a Massachusetts corporation ("April 1986 injunction"). By its terms the April 1986 injunction supersedes the October 1985 injunction.

2. On December 10, 1963, Alexis Lichine executed a consent authorizing ALC to use and register his name as its trademark. (Ex. 30).

3. The priority of use in the two marks is not a changed circumstance occurring after the 1986 April injunction. Moreover, it appears that Alexis Lichine first used the Alexis Lichine mark rather than the Prieuré–Lichine mark in the United States.

After being enjoined from operating the company under the SLES name or from using his own name to market wine in the United States, Sacha Lichine moved to California and worked as a wine distributor for Southern Wine & Spirits. In April 1987, he moved back to Bordeaux. Having partially reconciled his differences with his father, he began operating the vineyard at the Château Prieuré–Lichine. His father, an internationally known wine grower and merchant, authored the well known book, *Alexis Lichine's New Encyclopedia of Wines & Spirits.* (Tr. 18, pp. 71–72; Ex. 26.)

In June 1989, Alexis Lichine died. Already owning approximately 40% of S.A. de Château Prieuré–Lichine, Sacha Lichine inherited the remaining shares of the corporation, except for a percentage of one percent.[4] His inheritance was not necessarily foreseeable at the time of the 1986 injunction inasmuch as his relationship with his father was unpredictable. At the time of his father's death, the château consisted of approximately 62 to 63 hectares.[5] It presently comprises in excess of 200 acres. (Tr. 18, pp. 46–51; Tr. 19, p. 36; Ex. 29).

After inheriting the château, Sacha Lichine expended approximately $3,000,000 to upgrade the property. His improvements include building a new wine cellar, a visitor's center[6] and a sales shop, creating a stronger sales force, improving the physical plants and the vineyards and installing a helicopter pad. (Tr. 18, pp. 73–75).

The château produces a red wine made of several different grapes, including merlot, cabernet sauvignon and petit verdot. The volume of wine produced each year varies from 35,000 to 40,000 cases, each containing 12 bottles. Wines produced on the property are sold around the world, primarily under two labels, Château Prieuré–Lichine and Château de Clairefont. Château Prieuré–Lichine is a higher quality wine than Château de Claire-

font. The château also produces a third, lower quality wine, Haut–Médoc de Prieuré. (Tr. 18, pp. 46–50 & 76).

Sacha Lichine annually ships approximately 10,000 to 11,000 cases of Château Prieuré–Lichine and Château de Clairefont to the United States. He travels extensively on behalf of the château. (Tr. 18, pp. 77–78).

In 1989, Sacha Lichine produced one of the richest and fullest wines grown on the property in the last 30 years, according to Robert M. Parker ("Parker"), a noted wine expert and critic. As expressed by Parker in or around 1990, "Sacha Lichine appears to have very capably filled the shoes of his recently deceased father." (Ex. G).

In 1990, the château hosted the annual festival known as La Fete de la Fleur. Approximately 800 people attended the dinner event. Proprietors of different classified growths[7] of wine in Bordeaux and celebrities such as Charlton Heston, Brigitte Neilsen, Michael Caine, Donald Sutherland and Jerry Lewis, attended the dinner. Numerous publications covered the event. (Tr. 18, pp. 82–83; Ex. L).

Château Prieuré–Lichine wine is a *fourth* classified growth under the 1855 classification. It is listed under the cabernet sauvignon and French wine categories in an April 1993 poll conducted by and published in *Wine & Spirits* magazine. Two hundred wine managers at restaurants throughout the United States responded to the survey's questionnaire. Neither ALC nor Alexis Lichine wine is mentioned. (Tr. 18, pp. 100–102; Ex. M).

In September 1993, Sacha Lichine was one of the featured guests on an 11 day wine cruise which began in Hamburg, Germany. Approximately 800 passengers, primarily individuals from the United States, took part in the cruise. Michael Aaron ("Aaron"), Presi-

4. French law requires seven shareholders in order to denote a corporation "S.A."

5. One hectare is the equivalent of approximately two and one half acres.

6. The visitor's center existed prior to 1990 but only "in a very minor way." (Tr. 18, p. 80).

7. Classified growths of bordeaux wine originated in 1855 in conjunction with an exhibition in Paris. The 1855 classification categorized bordeaux wines from the Médoc and Sauternes districts into first, second, third, fourth and fifth growths. (Ex. 26, pp. 125–126 & App. A).

dent and Chairman of Sherry–Lehmann,[8] and Christine Hawley hosted the cruise. (Tr. 18, pp. 87–88 & 114; Ex. I).

Sacha Lichine is presently well known in the wine industry both in the United States and abroad. Since the 1986 injunction, he has been the subject of numerous English articles in publications such as *The Decanter, The Wine Advocate* and *Drinks International.* The articles focus on Sacha Lichine, although they also refer to his father. Sacha Lichine was the only "international judge" invited to participate in the Melbourne Wine Show in Australia. As indicated below, both Aaron and R. John Pellaton ("Pellaton"), Vice President and Marketing Director of Schieffelin & Somerset,[9] testified that since 1985 Sacha Lichine has acquired his own reputation for producing quality wine. It is therefore undeniable that Sacha Lichine has acquired a distinguished reputation associated with high quality French wine independent of his deceased father. (Tr. 18, pp. 98–99 & 103; Tr. 19, pp. 36–37, 40 & 45–46; Ex. L).

Aaron, who testified as a well qualified expert in wine retailing, stated that Sacha Lichine is well known by wine merchants and restaurateurs. He has a reputation for maintaining high standards. Thousands of people know who Sacha Lichine is although "not necessarily on a personal level," according to Aaron. (Tr. 18, pp. 125–129 & 135).

Since 1985, Sacha Lichine's reputation has become associated with quality wine. After inheriting the château from his father, Sacha Lichine proved to be a "great showman" and produced "some of the greatest wines in the history of" the château, according to Aaron. He is also "very well known" by consumers because of his coverage in a number of wine related magazines. Similarly, Pellaton testi-

fied that Sacha Lichine's reputation is associated with "super premium wines." (Tr. 18, pp. 121–129; Tr. 19, pp. 56–57).

### III. *ALC and Alexis Lichine Wines*

Aaron testified that whereas ALC formerly sold high quality wine, it now sells inexpensive wines. ALC began selling such inexpensive wines after Alexis Lichine sold the company in 1964, according to Aaron. (Tr. 18, pp. 129–130 & 157).

Aaron sharply distinguished wine produced by ALC, characterizing such wine as "vin ordinaire," [10] from wine produced by Sacha Lichine, which he characterized as high quality wine. Sherry–Lehmann does not stock ALC wines on a regular basis because the overall quality of ALC wines does not comport with the type of wine sold at Sherry–Lehmann. (Tr. 18, pp. 137–139).

Sacha Lichine similarly believes that the quality of ALC wine is lower than that produced at the Château Prieuré–Lichine. He testified that he tries to dissociate himself from ALC wines. (Tr. 18, pp. 104–105).

In the 1970s, ALC produced a low quality table wine which retailed for approximately $4 per bottle. The wine was grown in the Midi or Côtes Roussillon region in France. Alexis Lichine believed that the region could produce a better quality wine for exportation to the United States. (Tr. 18, pp. 184–186).

In or around 1989 and 1990, Pellaton researched ALC wines in order to determine if Schieffelin & Somerset should include the wines in its portfolio. After speaking with a number of retailers and wholesalers in the wine industry, Pellaton decided that Schieffelin & Somerset "could not get a return on [ALC wines]." He also opined that while ALC was "a very strong brand years and

---

8. Sherry–Lehmann, which began in 1934, is considered one of the leading wine stores in the United States. The store is located on Madison Avenue in New York City and primarily sells high quality wines. It also sells wines through its catalogue. It is a store known for its breadth and selection in wine. The store also promotes and sells Château Prieuré–Lichine. Depending on the vintage, the store annually buys an estimated 700 to 1,000 cases. (Tr. 18, pp. 113–118 & 128–129; Tr. 20, p. 70).

9. Founded in 1794, the Schieffelin Company was purchased in 1980 by Moët/Hennessy, a public company in France. In 1985, Moët/Hennessy merged with Louis Vuitton ("LVMH"). In 1987, Schieffelin & Somerset became part of a joint venture between LVMH and Guinness PLC, a company based in London. (Tr. 19, pp. 48–49).

10. The term "vin ordinaire" is associated with very low quality wine. (Tr. 18, pp. 138 & 146).

years ago," at the present time "it was probably not even a brand." (Tr. 19, pp. 53–55).

In March 1990, Crus et Domaines de France ("CDF"), a subsidiary of Pernod Ricard ("Pernod"), a French corporation, acquired ALC, including ALC's trademark rights. ALC operates as a negociant [11] and is one of three divisions of CDF. (Tr. 19, pp. 72–73 & 102).

Pernod is the world's leader in aperitive drinks, according to Jean Herpin ("Herpin"), Chairman of the Board and Chief Executive Officer of CDF as well as other subsidiaries of Pernod. At the time CDF purchased ALC, Herpin did not know of Sacha Lichine's claim or desire to use his own name on wine sold in the United States. Pernod has 50 subsidiary companies involved in alcoholic beverages, wines and nonalcoholic drink products. In the past five to six years, the "main thrust" of Pernod's acquisitions has been in wine. According to Herpin, ALC plays "a fundamental role" in this acquisition strategy by bringing international credibility through the ownership of "a French wine company trademark." As highlighted in Pernod's 1992 annual report, CDF owns a number "of prestigious wine merchants, such as Alexis Lichine." (Tr. 19, pp. 75–78, 90 & 96; Ex. 5 & 6).

Pernod's current strategy is to concentrate on appellation controlée wines such as Alexis Lichine and to sell premium brand wines and intermediate brand wines of a good quality. In 1992, Pernod sold its interest in a French wine company, Societé des Vins de France or SVF, which is primarily involved in common table wines. Pernod decided to retain CDF, however, because CDF, along with ALC, would complement the high level of quality in Pernod's spirit brands. As noted in a confidential Pernod document, the average retail price of a bottle of ALC wine sold in the

United States increased from $5.03 in 1993 to a projected figure of $11.22 in 1994. (Tr. 19, pp. 89–90 & 115–117; Ex. 5 & O).

In 1989, the year before Pernod purchased ALC, ALC's wine sales in the United States totaled approximately 60,000 to 80,000 cases. Sales of ALC wine in the United States decreased, however, after Pernod acquired ALC through CDF in March 1990. In 1991, CDF shipped 20,950 cases of ALC wine to the United States and sold 16,987 cases of ALC wine to retailers in the United States. In 1992 and 1993, respectively, CDF sold 14,209 and 9,418 cases of ALC wine in the United States.[12] Thus, there was a significant decline, or an estimated "50% decline in the volume," of ALC wine sold in the United States from 1991 to 1993. Projected sales of ALC wine in the United States for 1994 are 9,082 cases. (Tr. 19, pp. 93 & 102–107; Tr. 21, pp. 20–21; Ex. 7, 9 & O).

It is also true, however, that wine consumption in the United States, including the consumption of table wine, has declined since 1984. Since 1989, sales of French wine in the United States fell an estimated 30% while sales of ALC wines fell an estimated 60% to 80%. From 1991 through 1993, sales of French wine in the United States decreased an estimated 12% while, as noted above, sales of ALC wines decreased an estimated 50%. (Tr. 19, pp. 61–62, 109–110; Tr. 21, p. 21).

Herpin testified that ALC's sales volume in the United States has declined since 1984 because of the fall of the dollar in relation to the franc, an increase in the cost of bordeaux wine, competition from wines produced in other areas of the world and a change in distributors at the end of 1993. From 1985 to 1990, French wine imported into the United States decreased from approximately 33,000 gallons to 20,000 gallons. With respect to French table wine, importation decreased

---

11. A French negociant is similar to an agent. A negotiant is an entity or individual who "assures the commercialization of wines between producers, wine makers and distributors." A negociant buys, chooses and sells wine. (Tr. 18, p. 156; Tr. 19, pp. 72–73).

12. CDF also sold ALC wines in the United States which did not bear the Alexis Lichine label, i.e., Victor Bernard and Marquisat. The Victor Bernard and Marquisat labels constitute a significant portion of ALC wines sold in Texas, Louisiana and Colorado. (Tr. 20, pp. 4–5; Tr. 21, pp. 18–19; Ex. P).

In 1992 and 1993, respectively, CDF shipped an estimated 13,356 and 9,943 cases of ALC wine to the United States. Shipments therefore decreased approximately 35% between 1992 and 1993. (Tr. 21, pp. 19–20; Ex. O).

from 1985 to 1991 and increased from 1991 to 1992.[13] The exchange rate between the dollar and the franc, however, remained relatively stable from 1990 to the present. (Tr. 19, pp. 61–62, 79–80 & 103; Tr. 20, pp. 3–7 & 65–67; Ex. 7, 22, 24 & Q).

Austin Nichols, an affiliate of Pernod, presently imports and markets ALC wine in the United States.[14] Bruce Schwartz ("Schwartz"), Vice President of Marketing and Sales at Austin Nichols, became responsible for promoting and marketing the Alexis Lichine brand in the United States on behalf of Austin Nichols in "mid–1990."

Austin Nichols' marketing department, including Schwartz, "felt that there should be a defined segmentation within [Austin Nichols'] French wine portfolio, which consisted of Alexis Lichine and" another selection of table wines known as Cruse. They envisioned that Alexis Lichine wines would sell for a higher price and represent exclusive châteaux offered or provided to Austin Nichols. (Tr. 20, pp. 27, 36, 40–47 & 85–87; Tr. 21, p. 30; Ex. 32 & P).

Despite its desire to upgrade the image and quality of Alexis Lichine wines, Austin Nichols did not immediately implement its strategic initiatives because of the substantial amount of vin de table wine in the marketplace under the Alexis Lichine name in 1991

and 1992.[15] Nor did Pernod expend a significant amount of money promoting the Alexis Lichine brand. Between 1991 and 1993 Pernod expended approximately $100,000 annually on marketing the ALC line of wines or the "normal amount" of funds, according to Herpin. For 1994, CDF projects an annual expenditure of only $62,000.[16] (Tr. 19, pp. 104–107; Tr. 21, pp. 11–12 & 23; Ex. O).

Austin Nichols presently markets Alexis Lichine wines to "mid-level" and "upper-level" consumers.[17] It promoted ALC wines in print and/or television as a participant in an annual program run by Food and Wines of France. In the end of 1990 and early 1991, Austin Nichols used various pamphlets to promote the Alexis Lichine line of wines to retail outlets and restaurants in the United States. From 1990 to the present, in excess of 50 restaurants in the United States listed an Alexis Lichine wine on their wine lists. In or around December 1993, Austin Nichols mailed a number of bottles of Alexis Lichine wine to various wine writers in the United States. Recently, Austin Nichols described the Alexis Lichine line in a sales planner as a "select offering of world renowned wines." There is a possibility that American Airlines will purchase 1,200 cases of Château Lascombe wine from CDF in the near future.[18] (Tr. 20, pp. 44–47, 71–72, 89–94, 110–124).

13. The 1991/1992 increase reflects, in part, an impending increase in tariffs effective December 1992. (Tr. 20, pp. 67–68).

14. The previous importer was Shaw Ross International Importers, Inc. ("Shaw Ross"). Austin Nichols is a distiller of Wild Turkey bourbon, a manufacturer of soft drinks such as Yoo Hoo and Orangina, and an importer of a number of wines and spirits into the United States. Of the top 25 wine marketers in the United States in 1992, Austin Nichols ranked 24th. Total annual sales are approximately $150,000,000. (Tr. 20, pp. 28–29, 33, 35 & 55–56; Ex. 10 & 18).

15. Schwartz acknowledged that Austin Nichols would have to sell the existing line of Alexis Lichine wines acquired from Shaw Ross prior to fully implementing the above strategy. Initially, in 1991, Austin Nichols continued the marketing plans adopted by Shaw Ross. In 1992, Austin Nichols continued to sell through the existing line of Alexis Lichine wine acquired from Shaw Ross. In 1993, Austin Nichols arranged public relations activities for the revamped Alexis Lichine line of wines and established specific vol-

ume quotas. Its strategy for 1993 was to reposition Alexis Lichine wines into "a portfolio of mid to high priced wines." (Tr. 21, pp. 11–15 & Ex. P).

16. CDF sells approximately 25 to 30 different types of wine in the United States under the Alexis Lichine label. The retail price of ALC wines distributed through Austin Nichols ranges from $7 to $50 "per 750 ml." The average price per case of ALC wine sold to distributors from 1991 through 1993 was approximately $31. (Tr. 20, pp. 23, 47–48 & 57–61; Ex. 21 & O).

17. A bottle of wine selling in a price range of $4.00 to $7.99 would fall within the "mid-range" of the wine market, according to Schwartz. (Tr. 20, p. 138).

18. The prospective sale of 1,200 cases of Alexis Lichine wine to American Airlines is not included in the 9,082 figure noted *supra*. The 9,082 figure represents the projected number of cases of Alexis Lichine wine to be sold in the United States in 1994. (Tr. 20, p. 124 & Ex. O).

In June 1993, ALC began producing a "generic" bordeaux wine known as Premier de Lichine, according to Sacha Lichine. Herpin noted, however, that ALC sells two classified growths, Château Lascombe and Château Coutet.[19] He further testified that although ALC sells wines under "generic appellations" it is "extremely selective" in the quality of wine chosen. Herpin also noted that there are good as well as poor table wines. (Tr. 18, pp. 68–69; Tr. 19, pp. 80–81 & 90–91).

### IV. *The Lichine Name*

Sacha Lichine wishes to use his own name, in part, because the wine industry is a personalized business where one needs to associate a product with an individual. He also stated that all great French wines, particularly in Burgundy, have been selected by individuals. The United States market is also the largest market for quality estate bottled wines. (Tr. 19, pp. 41–44).

He would affix his own name in script and the name of the individual vineyard on select bottles of wine. By using his own name, he would hope to convey to the public that, as stated in his own words, "I had spent time and effort given the reputation that I have built for myself and that it would translate itself into the product and onto the wine." (Tr. 18, pp. 107–108).

Schwartz believes that permitting Sacha Lichine to market a wine in the United States under his own name would unfavorably impact the Alexis Lichine line marketed by Austin Nichols. According to Schwartz, use of the Alexis Lichine name on any bottle of wine represents "an inherent recommendation and an inherent quality" regardless of the retail price. The Alexis Lichine name thus implies an endorsement of fine quality wines. (Tr. 20, pp. 47 & 72).

On direct examination, Aaron testified that it would be "very important" for Sacha Lichine to be able to use his personal name.

(Tr. 18, pp. 135–137). On cross examination, however, Aaron stated the following:

I do not think that names are that important. As a matter of fact, I go out of my way to promote the name Sherry–Lehmann instead of the name Michael Aaron for the simple reason that that is the name of our company and its more advantageous and also better long term, you know for the reputation of Sherry–Lehmann to be protected.

(Tr. 18, pp. 142–143). Thus, Aaron differentiated personal names associated with individuals such as himself in the retail wine business from names associated with businesses, such as Sherry–Lehmann.[20] He implicitly emphasized that the more important name is that attributed to the business. And, he further acknowledged, as did Schwartz, that a number of successful French negociants do not operate under their personal names. (Tr. 18, pp. 142–144; Tr. 20, pp. 127–129).

Also on cross examination, Aaron recognized the importance of owning a trademark and the ability to decide what price range to sell products marketed under the trademark. He admitted that he would not want another store named Sherry–Lehmann to open in close proximity to his store even if the store only sold wine coolers. (Tr. 18, p. 150).

### DISCUSSION

In his post hearing memorandum, Sacha Lichine argues that this court should employ a flexible standard in considering the motion to modify. (Docket Entry # 76). Citing *Rufo v. Inmates of Suffolk v. County Jail,* — U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), Sacha Lichine contends that he "need only show that a significant change in circumstances" has occurred to justify modifying the injunction. (Docket Entry # 76, p. 10). Sacha Lichine further states that this flexible standard "applies to consent decrees issued in all contexts, not just in institutional

---

**19.** Aaron acknowledged that ALC sells Château Lascombe and Château Coutet. Château Lascombe is sold through a number of French negociants. Consequently, the importer's label is not significant, according to Aaron. These two chateaux are "very well known" and have a reputa-

tion regardless of what entity imports the wines into the United States. (Tr. 18, pp. 133–134).

**20.** Aaron limited his statement to apply to the retail wine business rather than the "business that Sacha Lichine is in." (Tr. 18, p. 143).

reform litigation (as in *Rufo* )." (Docket Entry # 76, p. 9). With respect to employing *Rufo's* more flexible standard, however, this court disagrees.

In *Swift*, the Supreme Court set the boundaries for modifying an injunction entered into with the consent of the parties. In the April 1, 1992 Order (Docket Entry # 49, p. 5), the district judge quoted the following standard from *Swift:*

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*United States v. Swift*, 286 U.S. at 119, 52 S.Ct. at 464.

Thus, although a court "cannot disregard substantial changes in law or fact that undermine the basis for the consent decree," *Williams v. Atkins*, 786 F.2d 457, 459 (1st Cir.1986), Sacha Lichine bears a heavy burden.[21] *Williams*, and the two First Circuit cases discussed therein,[22] involved subsequent changes in the law. It is also true, however, that changed factual circumstances may provide the basis to modify an injunction. *See, e.g., Food Fair Stores, Inc. v. Food Center, Inc.*, 356 F.2d 775 (1st Cir. 1966); *see also Fortin v. Commissioner of the Massachusetts Department of Public Welfare*, 692 F.2d 790, 800 (1st Cir.1982) (collecting cases whose "rationale ... is that when the relevant facts turn out to be different than supposed at the start, the decree may be altered to produce the original intended result"); *Lamphere v. Brown University in Providence*, 706 F.Supp. 131, 137 (D.R.I.1989). Thus, when the purpose of an injunction is no longer served, a court has the ability to alter the decree in order to effectuate or produce the originally intended result.

Citing a Seventh Circuit case, Sacha Lichine urges this court to extend *Rufo* to consent decrees issued "in all contexts." The First Circuit has not extended *Rufo* to all contexts and nor will this court. *See generally Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 340–341 & n. 15 (3rd Cir.1993) (discussing *Swift*, *Rufo* and Seventh Circuit's interpretation of *Rufo* as a general rejection of *Swift* ). Rather, the First Circuit has cited *Rufo* in the context of civil rights litigation, *Mackin v. City of Boston*, 969 F.2d 1273, 1275 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993), and otherwise noted that, *"[i]n institutional reform litigation* [emphasis added], injunctions should not operate in perpetuity." *In Re Pearson*, 990 F.2d 653, 658 (1st Cir.1993) (citing *Rufo* ). Other circuits have extended *Rufo* to employment discrimination class action suits, *United States v. City of Miami*, 2 F.3d 1497, 1505 (11th Cir.1993) and litigation effecting significant rights of a public nature concerning large numbers of people. *Patterson v. Newspaper*

---

**21.** In the context of discussing ALC's motion in limine, this court stated that it would *hear evidence* regarding certain issues to the extent such issues amount to a fundamental, substantial and/or significant change in law or fact. (Docket Entry # 63, p. 7). This statement does not, however, establish or set the standard applicable to *decide* whether to modify a prior injunction.

**22.** *Theriault v. Smith*, 523 F.2d 601 (1st Cir. 1975) (request to modify consent decree under which the defendant agreed to grant AFDC benefits to eligible pregnant women); *Coalition of Black Leadership v. Cianci*, 570 F.2d 12 (1st Cir.1978) (class action suit alleging civil rights violation).

*& Mail Deliveries' Union,* 13 F.3d 33, 38 (2d Cir.1993).

Because this case involves a dispute among private, commercial parties, however, this court declines to extend *Rufo's* flexible standard to the instant litigation. As aptly expressed by one court:

> Institutional reform cases present considerations not found in consent decrees settling commercial disputes, for commercial decrees affect only the parties to the particular suit, whereas institutional cases may impose action, or restrain action, in ways that transcend the persons involved in the suit and its settlement.

*W.L. Gore & Associates v. C.R. Bard, Inc.,* 977 F.2d 558, 562 (Fed.Cir.1992).

Recognizing that changed circumstances may nevertheless create a need to alter the April 1986 injunction and examining the equities, this court fails to find them substantial enough such that they undermine the basis for the April 1986 injunction agreed to by all the parties. The intended result of the original injunction was to bar Sacha Lichine from further infringing what was then a strong mark owned by ALC. While one purpose was arguably to prevent Sacha Lichine from riding the coattails of ALC's mark and this purpose no longer exists, the overriding intended result was to bar Sacha Lichine's use of the Alexis Lichine mark in order to protect ALC's property rights in its mark and to prevent confusion in the marketplace.[23]

Pernod, through CDF, purchased ALC and the corresponding right to use the Alexis Lichine mark on wine marketed and sold in the United States. Pernod, through CDF, has invested time and money, albeit not a substantial amount, into the mark and into producing a line of intermediate to high quality wines under the Alexis Lichine label.

Neither Pernod nor CDF have abandoned the use of the Alexis Lichine mark.

On the other hand, it is undeniable that factual circumstances have changed since 1986. The fact that Pellaton believes that ALC is no longer a brand indicates a change in the strength of the Alexis Lichine mark. The fact that ALC wine has deteriorated in quality similarly evidences a change in factual circumstances. Sacha Lichine's deserved rise to become a well respected figure in the wine industry known for producing premium quality wine is also a change in factual circumstances. While it was not unexpected that Sacha Lichine would remain in the wine industry, it was, to a certain degree, unexpected that he would reconcile with his father and inherit the château. Similarly, the marked decline in the quality and quantity of ALC wine sold in the United States since 1986 was not readily anticipated in April 1986.[24]

These facts, however, do not deprive ALC of its property right to the Alexis Lichine name in light of the equities of this case. While ALC wine has changed in quality since the April 1986 injunction, it is not devoid of quality, as testified to by Herpin. Moreover, in the 1970s ALC was already selling an inexpensive table wine. It was also foreseeable in April 1986 that Alexis Lichine would eventually die. The fact that Sacha Lichine has an interest in using his name does not alter this court's decision.

The change in circumstances also do not impose an extreme hardship upon Sacha Lichine. A number of successful French negociants do not operate under their personal names. Sacha Lichine may still produce and market a premium quality wine under a label which does not bear his name. Pernod de-

---

23. Thus, while Sacha Lichine submits that he has an interest in using his surname (Docket Entry # 76, pp. 10–13), there is also the countervailing interest in avoiding the confusion resulting from the use of the Alexis Lichine name and the Sacha Lichine name on bottles of wine produced and marketed by wholly distinct entities. The standard applicable to altering or upholding a preliminary injunction as put forth in *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62 (2d 1985) and *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731 (2d 1978), also differs from the standard applicable to modifying a consent decree or permanent injunction entered into with the consent of the parties.

24. The decreased consumption of French wine in the United States, however, modifies the effect of this consideration as do the factors noted by Herpin.

sires to retain the Alexis Lichine mark·just as Sacha Lichine desires to market a premium wine under his name.

In addition, although Sacha Lichine was at a young age when he agreed to the April 1986 injunction, the injunction was and. is a voluntary and conscious decision. *See United States v. Boch Oldsmobile, Inc.,* 909 F.2d 657, 660 (1st Cir.1990) (noting particular reluctance to reopen consent decrees under which parties voluntarily and consciously decide not to contest elements of a case). *Res judicata* principles also deserve consideration although such principles are not inviolate. *See W.L. Gore & Associates v. C.R. Bard, Inc.,* 977 F.2d at 561; *Money Store, Inc. v. Harriscorp Finance, Inc.,* 885 F.2d 369, 372 (7th Cir.1989).

Finally, while Sacha Lichine was an eloquent and extremely credible witness, the testimony of his expert, Aaron was particularly damaging. Aaron reinforced the importance of trademark rights and the unimportance of the use of personal names in the wine retailing business.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS** [25] that Sacha Lichine's motion to modify the injunction (Docket Entry # 39) be **DENIED**.

---

[25]. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).