**ALEXIS LICHINE & CIE.,
Plaintiff, Appellee,**

v.

**SACHA A. LICHINE ESTATE SELEC-
TIONS, LTD, and Sacha Lichine,
Defendants, Appellants.**

No. 94–1918.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 1994.

Decided Jan. 30, 1995.

Stanley S. Arkin with whom Harry B. Feder, New York City, was on brief, for appellants.

Jonathan E. Moskin with whom Robert M. Kunstadt, New York City, was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

COFFIN, Senior Circuit Judge.

In this trademark case a French wine grower and merchant seeks to modify a consent decree that bars him from using his family name in his wine importation business because of possible confusion with products offered by the current owner of his late father's company. After an evidentiary hearing, the district court accepted the recommendation of the magistrate judge that the requested modification be denied, 855 F.Supp. 479. The appeal requires us to consider both the appropriate standard and the district court's exercise of discretion in applying that standard. We affirm.

### History of the Case

In 1946 Alexis Lichine began to import French wines into the United States. In 1951 he purchased Chateau Prieure–Cantenac, a wine-growing chateau in the Haut–Medoc region near Bordeaux, which he renamed Chateau Prieure–Lichine (CPL). In 1955 he founded his own wine-trading company, Alexis Lichine & Cie. (ALC), and in 1964 ALC registered "Alexis Lichine" with the U.S. Patent Office. Shortly thereafter, in October 1964, Lichine sold ALC and its mark to a company affiliated with a major organization in the wine industry, Bass Charrington. Not involved in the sale was CPL or its mark, which also had been registered in the U.S. Patent Office in July 1964.[1]

In the early 1980s, Alexis's son started his own wine brokerage company, Sacha A. Lichine Estates Selections, and began importing wines into the United States. Predict-

---

1. ALC was a "negociant," an enterprise that chooses and buys wines from producers, and then stores, ages, bottles and sells them under its own trademark. A chateau, on the other hand, is restricted to selling only wines produced on its premises.

ably, ALC brought a trademark infringement suit. The court granted partial summary judgment for ALC, concluding that the similarity of names was such as to render confusion among customers likely.

In 1986, a consent decree was issued enjoining Sacha from using the words Alexis Lichine "or any colorable imitation," including Sacha A. Lichine, S.A. Lichine, or Lichine, in connection with the sale of any alcoholic beverage. ALC waived several causes of action, as well as claims for damages and profits. Both parties assumed their own costs and attorney's fees, and waived appeal.

In 1987, Sacha, who had been estranged from his father, returned to CPL. Alexis was by this time widely recognized in the wine industry and had written authoritative books on French wines, as well as his famous "Alexis Lichine's New Encyclopedia of Wines and Spirits." When Alexis died two years later, Sacha inherited the chateau.

In early 1990, the Bass Charrington interests sold ALC to another giant, Pernod Ricard (Pernod). ALC is now one of three entities managed by a Pernod subsidiary, Crus et Domaines de France. Meanwhile, as shall be detailed later, Sacha had been improving both the operations of CPL and his own reputation, and wanted to expand his imports into the United States beyond the 10,000 or 11,000 cases of his own chateau's wine. In August 1991 he requested relief from the burdens of the injunction, and in April 1992 was allowed to seek modification under Fed.R.Civ.P. 60(b)(5).

## Proceedings Below

Appellant urged three reasons to modify the injunction to permit him to use his name on certain bottles of imported wine: the death of Alexis Lichine and his inheritance of his father's shares in CPL; the decline in the quality of wines sold by ALC and in ALC's reputation; and the improvements in CPL's capacity and product and the rise in Sacha's own reputation. He sought to demonstrate that a Sacha Lichine wine label no longer would infringe on the trademark derived from his father's name and that, in fact, his own name was now of greater significance in the wine world than ALC's.

ALC, on the other hand, contended that there had been no unanticipated change of circumstances since the injunction, that its reputation continued to be high, that its reliance on the exclusive right to use of the Lichine name and reputation still was strong, and that Sacha was suffering no hardship and was not prohibited from merchandising wines in the United States under other names.

Appellant presented evidence during the four day hearing showing that he had invested some $3,000,000 on improvements to his chateau. He added a new wine cellar, a visitors' center, a sales shop and a helicopter pad, and also improved the sales force, physical plant and vineyards. The harvest of 1989 was rated as particularly good. Appellant also had exhibited a promotional flair, had been featured in a number of magazine articles, had participated in prestigious fetes and cruises, and now enjoyed a reputation in the wine industry independent of his father's. In contrast, appellant's witnesses testified, ALC's wines had sunk in recent years to lesser quality, "vin d'ordinaire" status. Moreover, ALC's sales in the United States had declined by some 50 percent between 1991 and 1993, a much greater decline than had affected the general market of French wine imports.

ALC's evidence was to the effect that Pernod Ricard, world leader in the aperitif field and owner of some 50 companies, bought ALC in 1990 before it was aware of appellant's effort to modify the injunction. The purchase was part of its "main thrust" in acquisitions to increase its presence in the wine industry. Pernod officials testified to a current strategy to "reconcentrate" on better wines and considered ALC to be basic to that strategy.

As early as 1990, an ALC official in Bordeaux had recommended that table wine should be "progressively erased from the entire ALC's line" and that "A. LICHINE should return to its original concept initiated by ALEXIS." A subsequent higher level recommendation was made by the vice president in charge of marketing and sales for

Austin Nichols, the company charged with carrying out the marketing plan involving ALC. He described his recommended objective as effecting "a defined segmentation" with one entity (Cruse) representing "the most popular-priced volume-oriented table wines" and Alexis Lichine representing the "exclusive chateaus that we would have offered to us."

This recommendation, he further testified, was accepted and reflected in a document entitled "Alexis Lichine—Cruse—1993." Under "Strategy" were these comments:

Reposition Alexis Lichine to a portfolio of mid to high prices [sic] wines.

Reposition Cruse to include mainly low priced table wines and mid-priced varietals with a limited line of Petits Chateaux.

Notwithstanding these resolves, Pernod first needed to dispose of its existing inventories of wines in a declining market. As a result, little headway had been made with the new strategy at the time of the hearing on Sacha's request for a modification. Certain steps had been taken, however. Higher priced wines were being marketed, promotional literature was being pushed, wine writers were being wooed, ALC wines were reaching a considerable number of restaurant wine lists, participation in important wine promotions had taken place, and entry into the airline market was underway.

The magistrate judge found that ALC had invested in ALC wines, though not in large amounts; that the company had not abandoned the mark, and indeed was dealing in wine "not devoid of quality"; that, nevertheless, there had been a decline in both quality and quantity of ALC wine sold in the United States since 1986; and that Sacha Lichine now was a well respected figure in the wine industry, known for producing high quality wine.

On the legal standard, however, the magistrate judge specifically refused to apply the "more flexible" approach for evaluating requests to modify consent decrees that was articulated in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 379–81, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992), and instead adhered to the sterner ("grievous wrong")

standard of *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). Emphasizing the private commercial nature of this litigation, the weight to be given the interest in the finality of decrees, and the lack of extreme hardship to appellant, she concluded that there was insufficient basis to dilute ALC's property rights in the Alexis Lichine name.

The district court, in reviewing the magistrate judge's report, faced two issues. The first concerned the testimony of an appellant's witness, one Aaron, who had testified that the use of a personal name was not significant for retail merchants but would be "very important" for Sacha Lichine. The magistrate judge mistakenly understood the testimony to be the converse. The court observed that the fact that the family name was important to appellant nevertheless did not warrant modification of the injunction. We might also observe that there was testimony from the same witness and two others that a considerable number of "negociants" did business under other than personal or family names.

The more important ruling by the district court was directed to the issue of the appropriate standard governing modification of decrees. The court said:

Even assuming that *Rufo* has liberalized the standards for the modification of decrees as argued by the defendant, there is still a valid public policy in favor of the finality of dispute resolutions. In my opinion, the defendant has not offered sufficient reason to overturn that policy.

### Discussion

■ *Standard governing modification.* We first consider the issue of the appropriate standard of review governing modification of injunctions. Rule 60(b)(5) provides for relief from a judgment when "it is no longer equitable that the judgment should have prospective application." In *Swift,* which dealt with a request from meat-packers convicted of manipulating the industry to soften an injunction's proscriptions against them, the Supreme Court stated that a party seeking release from a consent decree must offer proof of "hardship so extreme ... as to

586

justify ... saying that they are the victims of oppression," or, in other words, the party must make "a clear showing of grievous wrong." *Id.* 286 U.S. at 119, 52 S.Ct. at 464.

Reaffirming the need for flexibility emphasized in *Railway Employees v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371–72, 5 L.Ed.2d 349 (1961), the Court in *Rufo* disavowed any "talismanic quality" in the *Swift* language or intent that modifications of consent decrees in all cases were to be governed by the standard "actually applied" there. It stated that Rule 60(b)(5) "permits a less stringent, more flexible standard." *Rufo,* 502 U.S. at 380, 112 S.Ct. at 758. While *Rufo* was a case involving institutional reform, we do not read it as being confined in principle to such cases. In our view, Rule 60(b)(5) sets forth the umbrella concept of "equitable" that both *Swift* and *Rufo* apply to particular, widely disparate fact situations.

Indeed, the *Rufo* Court quoted the basic distinction drawn in *Swift* between decrees protecting "rights fully accrued upon facts so nearly permanent as to be substantially impervious to change" and decrees involving "the supervision of changing conduct or conditions and are thus provisional and tentative." *Id.* 502 U.S. at 379, 112 S.Ct. at 758 (quoting from 286 U.S. at 114–15, 52 S.Ct. at 462–63). *Swift* illustrates the former and *Rufo* the latter. We view this not as a limited dualism but as polar opposites of a continuum in which we must locate the instant case.

We therefore agree with cases like *In re Hendrix,* 986 F.2d 195, 198 (7th Cir.1993), viewing *Rufo's* flexible standard as "no less suitable to other types of equitable case[s]," but also share the concerns voiced in cases like *W.L. Gore & Assocs. v. C.R. Bard, Inc.,* 977 F.2d 558, 560–62 (Fed.Cir.1992), about the importance of finality when a decree is based on a negotiated bargain in a commercial case between private parties. Thus, rather than saying either that there is an "institutional reform" exception to *Swift* or a "private commercial party" exception to *Rufo,* we apply Rule 60(b)(5) having in mind

that we are dealing with a decree arising from a commercial dispute and based on a bargain voluntarily entered into by businessmen represented by lawyers.

Such a decree is shielded from facile modification by a rather formidable carapace. The public interest noted in *Rufo* is not a factor, *see* 502 U.S. at 379–83, 112 S.Ct. at 758–59, other than the interest of the public in general and the business community in particular in the stability of final agreements. Nor is it persuasive that "it is no longer convenient to live with the terms of a consent decree." *Id.* at 383, 112 S.Ct. at 760. Therefore, in considering whether a decree arising out of commercial litigation between two private parties should be modified,[2] a court should look to such factors as the circumstances leading to the decree (including the nature of a party's initial wrongdoing), the quantum of hardship on the burdened party, the duration of the burden thus far and the prospect of its continuing, and the benefitted party's need for a continuation of the decree. Such inquiries, however, must not cast a judge in the role of umpire in a contest over the performance or popularity of companies.

Of course, in reviewing the actions of the trial court, we may reverse only for error of law or abuse of discretion. *United States v. Boch Oldsmobile, Inc.,* 909 F.2d 657, 660 (1st Cir.1990).

*Application of standard.* Having set forth our approach, we have no difficulty in affirming the action of the district court. The sale transaction of 1964 was a bargained for, arm's length transaction for, we assume, ample consideration. This was followed by a lawsuit and a solemn consent decree, this also for the substantial consideration of waiver of claims for damages, profits, costs, and attorney's fees. A fairly short time has transpired since the decree, and an even shorter time since Pernod acquired ALC. And although Pernod and its subsidiary have made little progress in rebuilding the fortunes of ALC, there have been the obstacles of out-

**2.** Arguably, a different approach might be appropriate when such cases involve issues more laden

with a public interest, such as antitrust.

side economic forces as well as the dead weight of existing inventory. We cannot say that Pernod's incipient strategy for ALC is a fabrication or without substance. Finally, appellant cannot be said to be suffering to any unconscionable degree.

Reading the transcripts of the several days of testimony, we found ourselves in an unreal world. This seemed to have turned into a trial of the efficacy of ALC's business operations. Appellant could tweak the tail of the lion and boast his own accomplishments. Much time was spent on sales figures, the amount spent on promotion, the number of people hired, ratings and image. One was tempted to feel that the issue was: who had done the best job in promoting oneself and one's wines in the past several years?

■ But that is not the question. Unlike a sporting event, the parties do not have the same starting points. The trademark holder and his decree occupy a favored position. The challenger faces a considerable task in establishing a balance of equities favoring him.

There is an understandable paucity of cases involving the modification of consent decrees entered into by two commercial parties. We have found one, *Tetra Sales (U.S.A.) v. T.F.H. Publications, Inc.*, 727 F.Supp. 92 (S.D.N.Y.1989), which involved an effort by another trademark infringer who sought relief from a decree. Although the court's decision was issued before *Rufo*, it was required to adhere to the teaching of Judge Friendly's opinion in *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir.1983), which foreshadowed *Rufo*. *See* 502 U.S. at 379-83 & n. 6., 112 S.Ct. at 758-59 & n. 6.

In *Tetra Sales*, the court declined to follow the recommendation of a magistrate that a consent decree be modified to allow a publisher to adopt a format for book covers that differed from that required by the decree. The court noted an earlier trademark case, *King-Seeley Thermos Co. v. Aladdin Industries*, 418 F.2d 31, 35 (2d Cir.1969), in which Judge Friendly cautioned that the power to modify should be "sparingly exercised," but concluded that relief should be available if the appellant there could show that the de-

cree too narrowly limited use of a trademark that had become generic. A two year period since the decree was held "not such a long period of time that the Court should rush to make changes in the carefully negotiated agreement between the parties." 727 F.Supp. at 96. The court further noted the presence of contested evidence and the need for rigid restrictions to "bring some peace to a highly charged situation," *id.* at 97, and held that defendant had failed to carry its considerable burden.

We feel similarly about this case.

■ We conclude by noting briefly appellant's contention that the district court did not balance ALC's trademark interest against his interest in using his own name. The principal cases cited give him little comfort. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288-89 (9th Cir.1992), allowed a family member to continue using his name in a limited fashion on a different product—cheese, not wine. *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 590 F.2d 701, 703-04 (2d Cir.1978), wound up approving a very restrictive injunction, which also embodied a disclaimer. The same court, more recently, has evidenced deep skepticism of the utility of disclaimers and, in any event, would require empirical evidence demonstrating their effectiveness in avoiding confusion. *Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, 1315-17 (2d Cir. 1987).

In the case at bar, there was no argument or evidence concerning the subject of disclaimers. The only "balancing" suggested was a request that appellant be allowed to use his own full name in a different label format. In light of the not-so-old decree, which found that the use of the Lichine name would be likely to cause confusion, we see no abusive lack of balancing on the part of the court.

In sum, at this time, on this record, we cannot say that the district court abused its discretion.

*AFFIRMED.*