

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-11-1995

# Building & Contstruct v NLRB

Precedential or Non-Precedential:

Docket 95-3330

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Building & Contstruct v NLRB" (1995). *1995 Decisions.* Paper 250.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/250

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 95-3330


BUILDING AND CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA
AND VICINITY, AFL-CIO; PATRICK GILLESPIE,

Petitioners

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent


Sur Motion To Dissolve Permanent Injunctions
and Vacate Contempt Adjudications

Argued July 31, 1995

Before:  SLOVITER, Chief Judge, BECKER and
SAROKIN, Circuit Judges

(Opinion filed  September 11, 1995)


Bernard N. Katz (Argued)
Steven David Masters
Meranze and Katz
Philadelphia, PA 19102

    Attorneys for Petitioners

Stanley R. Zirkin (Argued)
  Deputy Assistant General Counsel
  Contempt Litigation Branch
William Wachter
  Assistant General Counsel
Washington, D.C. 20570

Attorneys for Respondent

OPINION OF THE COURT

SLOVITER, Chief Judge.

The Building and Construction Trades Council (BCTC or "unions"), an unincorporated association composed of affiliated labor organizations, and Patrick Gillespie, its business manager, have moved to dissolve three consent judgments enforcing orders of the National Labor Relations Board and to vacate four consent contempt adjudications for violating the consent judgments. The NLRB vigorously opposes the motion. After giving the parties the opportunity to file written memoranda in support of their respective positions, we heard oral argument. We will deny the motion for the reasons that follow.

I.

The history of this case goes back more than twenty years. On March 4, 1974 this court entered a consent judgment pursuant to stipulation by the parties enforcing an order issued by the NLRB against BCTC and J. Yorck, the business agent for the local union. Some indication of the background of the order can be gleaned from the Board's Findings of Fact that the Firestone Tire and Rubber Company was engaged in the manufacture and sale of tires at Pottstown, Pennsylvania, and that it engaged the M.A. Matlock Construction Company as a subcontractor to perform certain work at its plant. The agreed-upon order directed BCTC to cease and desist from picketing at the Pottstown plant and inducing or encouraging any of Firestone's employees to refuse to work or handle goods with the object of getting Firestone to cease doing business with Matlock.

The language of the order tracked section 8(b)(4)(B) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(B), which prohibits secondary boycotts by labor organizations, and directed BCTC to cease and desist from:

> In any manner or by any means . . . engaging in, or inducing or encouraging any individual employed by . . . any . . . person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment . . . to perform any service, or in any manner or by any means, threatening, coercing, or restraining . . . any . . . person engaged in commerce or in an industry affecting commerce where, in either case, an object thereof is forcing or requiring . . . any . . . person . . . to cease doing business with . . . any other person.

Exhibit A to Affidavit of Patrick Gillespie at 3.

In 1980, this court was again presented with a Decision and Order of the NLRB reflecting a settlement stipulation and a consent judgment, which we entered on November 28, 1980, that provided that the unions would cease and desist from engaging in a secondary boycott, this time of Atlantic Richfield Company (Arco) and Gulf Oil Company. Specifically prohibited was any action encouraging employees of Gulf, Arco or others to refuse to work or handle any goods with the object of requiring Gulf, Arco or others to cease doing business with Refinery and Industrial Maintenance, Inc., a company engaged in the business of providing maintenance and repair work for refineries and industrial plants from its Eddystone, Pennsylvania facility. The order enforced by this consent judgment contained the same language quoted above. Exhibit B to Gillespie affidavit.

On May 24, 1982, following proceedings brought by the NLRB to hold BCTC in civil contempt, BCTC stipulated that it was in civil contempt of the judgments entered March 4, 1974 and November 28, 1980 and consented to the entry of a Contempt Adjudication. The adjudication ordered BCTC to purge the contempt by, inter alia, complying with the consent judgments and imposed a fine of $6500 for each future violation and $500 per day that each such violation continued. Exhibit D to Gillespie affidavit.

Almost contemporaneously, the NLRB once again found itself faced with charges that BCTC was responsible for secondary boycotts, and once again it entered a Decision and Order, this time on February 22, 1983, approving a Settlement Stipulation that BCTC would cease and desist from such activity designed to coerce anyone from dealing with a long list of companies. Once again, this court entered a consent judgment, on June 10, 1983, which enforced the order containing language requiring BCTC to cease and desist from the secondary boycott activity. Exhibit C to Gillespie affidavit. Significantly, one of the charging parties in the 1983 matter, Schnabel Associates, Inc., a company engaged in the construction business as a general contractor from its Harleysville, Pennsylvania facility, objected to the inclusion in the Settlement Stipulation of the "nonadmission clause" traditional in such settlements. Schnabel argued that the stipulation should contain an admission of liability, and cited "the Respondent's proclivity to violate the Act" in support of its objection. Id. at 2. The General Counsel took the

position before the Board "that a nonadmission clause is not inappropriate under the circumstances of this case," and that he was satisfied that "the Settlement Stipulation fully remedies the unfair labor practices alleged." Id. The Board upheld the General Counsel's position.

Nonetheless, on January 31, 1984 BCTC once again agreed to a consent contempt adjudication for violating the March 4, 1974 and November 28, 1980 judgments and the May 24, 1982 contempt adjudication. This adjudication required payment of a compliance fine of $3,000 to purge BCTC of the contempt, imposed a compliance fine of $13,000 for each future violation, and set a further compliance fine of $1,000 a day for each continuing violation. See Exhibit E to Gillespie affidavit.

The activity prohibited by the three consent decrees and the two earlier consent contempt adjudications continued. On August 4, 1986 and again on August 4, 1989 BCTC agreed to consent contempt adjudications which increased the stipulated violation and per diem fines. See Exhibits F and H of the Gillespie affidavit. The proceeding culminating in the 1986 consent adjudication had also been brought against the individual members of BCTC's Executive Board. Under the 1989 consent adjudication Gillespie himself, the BCTC business manager, was deemed personally in contempt. The 1989 contempt adjudication required BCTC and Gillespie to purge the contempt by, inter alia, complying with the prior judgments and contempt adjudications, notifying officers, agents, members and employees of BCTC and its affiliated unions of the contempt adjudication, and refraining

from authorizing and permitting picketing by any representatives or agents of BCTC without taking prescribed steps to ensure that the picketing will be lawful and permissible under the prior judgments and contempt adjudications. BCTC was also assessed the sum of $250,000 for past noncompliance, with $150,000 payable in installments and $100,000 suspended on condition of future compliance. The prospective fines against BCTC were increased to $100,000 per violation and $10,000 per day that each such violation continues. A prospective fine of $5000 per violation and $500 per day was imposed against the business manager and any other officer, employee, agent, or representative of BCTC who knowingly violates the order. Finally, BCTC agreed that, upon filing of any unfair labor practice charge alleging acts falling within the scope of this court's prior orders and adjudications, it would furnish the NLRB with all evidence in its possession concerning the charge within 14 days of a request by the NLRB.

BCTC now moves to dissolve the consent judgments and vacate the contempt adjudications on the grounds that (1) BCTC has completely purged itself of contempt; (2) BCTC has completely complied for a significant length of time; (3) BCTC is suffering "undue hardships and vexatious harassment" because of the judgments and contempt adjudications; and (4) continued enforcement is no longer equitable.

The NLRB opposes the motion because (1) BCTC has not demonstrated that it has complied with and will comply with the judgments and contempt adjudications; (2) the purpose of the judgments and adjudications -- permanently restraining BCTC from

violating section 8(b)(4)(B) -- has not been accomplished; (3) BCTC has failed to show any substantial injury or hardship; and (4) BCTC has failed to demonstrate any other change of circumstances justifying exceptional relief.

## II.

The parties dispute the correct legal standard to be applied to BCTC's motion to dissolve the injunctions. The NLRB would have us apply a standard culled from language used by the Supreme Court more than sixty years ago in United States v. Swift & Co., 286 U.S. 106 (1932). In Swift, the government had sued the five leading meat packers to dissolve a monopoly that they had acquired in meat products and which they were taking steps to extend into other foods. In 1920, defendants entered into a consent decree consenting to some dismemberment and, inter alia, prohibiting them from manufacturing, selling or transporting any of 114 grocery products. Although defendants managed to avoid the full impact of the decree through legal proceedings for a while, when they could no longer do so they moved to modify the decree, citing changed conditions in the industry. The district court granted a modification to permit defendants to deal at wholesale in groceries.

The Supreme Court reversed, finding no "grievous wrong" arising from continued operation of the decree. The Court stated that when a party seeks to modify or dissolve an injunction, entered by consent or otherwise, because of changed circumstances, the inquiry differs from the framing of a decree:

> The inquiry . . . is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a <u>clear showing of grievous wrong evoked by new and unforeseen conditions</u> should lead us to change what was decreed after years of litigation with the consent of all concerned.

<u>Id.</u> at 119 (emphasis added).

BCTC argues that labor injunctions "enjoy a greater presumption of limited duration" than other injunctions. BCTC Reply Memorandum of Law at 3. Surprisingly, it relies for this proposition on <u>Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.</u>, 312 U.S. 287 (1941), in which the Court upheld an injunction imposed by the state supreme court prohibiting peaceful picketing as well as acts of violence by a union which had interfered with the distribution of the products of a dairy. Because of the heavy reliance BCTC places on the <u>Milk Wagon Drivers Union</u> case, we examine it closely.

The Supreme Court had previously held that state statutes prohibiting all picketing near an employer's place of business violated the constitutional protection of free speech. <u>See</u> <u>Thornhill v. Alabama</u>, 310 U.S. 88 (1940); <u>Carlson v. California</u>, 310 U.S. 106 (1940). The <u>Milk Wagon Drivers Union</u> case gave the Court the opportunity to consider again the constitutional issue of the right of a state to prohibit peaceful picketing. In upholding the injunction, the Supreme Court explained that this case was different than the preceding cases

because of the coercive effect of the violence.  The following language repeatedly stressed by BCTC was written in the context of injunctions limiting the free speech right to picket, not in connection with any motion for modification of a consent decree or a litigated injunction applicable to labor injunctions in general:

> The injunction which we sustain is "permanent" only for the temporary period for which it may last.  It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted.

Milk Wagon Drivers Union, 312 U.S. at 298.  The Court continued this paragraph by noting that there was no argument by the union that the coercive effect of the violence had disappeared.

Thus, the facts are not "closely parallel" as BCTC contends, nor does this language support BCTC's argument that the Supreme Court has "held" that labor injunctions are to be viewed in a different light.  To be sure, a "permanent" injunction does not automatically operate in perpetuity and a labor injunction, like any other injunction, may be modified or vacated according to "familiar equity procedure."  However, nothing in the Milk Wagon Drivers Union case suggests that labor injunctions enjoy any presumption of limited duration greater than any other injunction.

Nor does it suggest that Swift was not to be applied in labor cases.  This court has regularly applied Swift in evaluating a defendant's request for relief from an injunction,

both in labor cases and otherwise. In International Bhd. of Teamsters v. Western Pa. Motor Carriers Ass'n, 660 F.2d 76 (3d Cir. 1981), an employers' association which had entered into a consent decree with the union that it would not engage in "spotting" (the practice of instructing a driver not to remain with the trailer during loading and unloading and assigning the driver to other duties) moved to modify the injunction so that it would apply only to the Allegheny County members. We affirmed the district court's denial of the motion to modify, stating that the association had not made the necessary "showing of exceptional circumstances." Id. at 85; see also United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1088 (3d Cir. 1987).

Similarly, in Mayberry v. Maroney, 558 F.2d 1159 (3d Cir. 1977), we denied modification of a consent decree entered in 1973 that enjoined prison officials from confining any inmate at the State Correctional Institute at Pittsburgh in a basement facility known as the Behavior Adjustment Unit (BAU). The district court had granted the motion of prison officials to vacate the decree so that unruly prisoners could be confined there on an emergency basis for a maximum of 48 hours. We reversed, holding that where the parties agreed to and the court sanctioned the closing of an allegedly offensive facility, "the Commonwealth may not now artificially create its own 'changed circumstance,' and thus relieve itself from a free, calculated and deliberate choice, by offering a substitute remedy which provides a lesser safeguard against the injuries complained of on

behalf of the class."  Id. at 1163.  We recognized that the alternative remedy would have been more convenient for the defendants and might have been "neither unjust nor unreasonable," but we confined our inquiry to whether anything had happened to justify changing the decree, not how the decree might best have been framed.  Id. at 1163-64.  Inasmuch as the need to use the BAU in event of emergency was not found to be greater than that which existed at the time of the decree, the "changed circumstances" asserted by the defendants were insufficient to warrant vacating the decree.

Different considerations apply when the party seeking to modify the consent decree wishes to strengthen its prohibition because the purpose for which the decree had been framed has not been fully achieved.  In United States v. United Shoe Machinery Corp., 391 U.S. 244 (1968), the government sought a modification of a consent decree adopted to settle an antitrust case.  When the government sought further relief than that originally provided, defendant relied on Swift for its claim of the immutability of the original consent decree.  The Supreme Court reversed, explaining that nothing in Swift precludes such a modification "upon an appropriate showing."  Id. at 248.

The principal issue before us is to analyze the effect of the Supreme Court's recent decision in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), on the standard previously applied to requests to modify an injunction.  In Rufo, four years after the modification of a consent decree which prohibited double bunking of pretrial detainees in a new jail to

be constructed, the county sheriff moved to modify the decree to allow double bunking, citing an increase in the pretrial detainee population. Federal Rule of Civil Procedure 60(b)(5), which was promulgated more than a decade after the Swift decision, authorizes a court to grant relief from a final judgment if "it is no longer equitable that the judgment should have prospective application." The district court denied the sheriff's motion, holding that Rule 60(b)(5) codified the "grievous wrong" standard of Swift. The Court of Appeals affirmed. The Supreme Court disagreed.

In Rufo, the Court engaged in an extensive discussion of the considerations relevant to the issue before us. It disagreed with the lower court's construction of Rule 60(b), explaining that Swift did not represent a hardening of the traditional flexible standard for modification of consent decrees. Id. at 379. It noted that the Court in Swift itself distinguished the facts before it from the case in which genuine changes required modification of a consent decree. The "grievous wrong" standard was not intended to take on a "talismanic quality, warding off virtually all efforts to modify consent decrees." Id. at 380. Instead, the language of Rule 60(b) "permits a less stringent, more flexible standard" for relief from a final judgment and allows a court to decide when "it is no longer equitable that the judgment have prospective application." Id.

The Rufo Court then turned to the case before it, noting that the upsurge in institutional reform litigation since

Brown v. Board of Education, 347 U.S. 483 (1954), has made a district court's ability to modify a decree in response to changed circumstances all the more important. A flexible approach "is often essential to achieving the goals of reform litigation." Rufo, 502 U.S. at 381. The rigidity displayed by the district court was thus "neither required by Swift nor appropriate in the context of institutional reform litigation." Id. at 382.

Nonetheless, the Court inserted a note of caution, stating that modification is not warranted in all circumstances. It stated that even when seeking modification of an institutional reform consent decree, the party seeking modification must establish "that a significant change in circumstances warrants revision of the decree." Id. at 383. Rule 60(b)(5) does not authorize relief merely "when it is no longer convenient to live with the terms of a consent decree." Id. Modification may be appropriate when changed factual conditions make compliance with the decree substantially more onerous, when a decree becomes unworkable because of unforeseen obstacles, or when enforcement of the unmodified decree would be detrimental to the public interest. Id. at 384. However, modification should not ordinarily be granted "where a party relies on events that actually were anticipated at the time it entered into a decree." Id. at 385.

The Court stated in conclusion, "[W]e hold that the Swift 'grievous wrong' standard does not apply to requests to modify consent decrees stemming from institutional reform

litigation. Under the flexible standard we adopt today, a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." Id. at 393.

This court has not yet decided whether it should read the Supreme Court's decision in Rufo as generally applicable to modifications of consent decrees. In Favia v. Indiana Univ. of Pa., 7 F.3d 332, 341 n.15 (3d Cir. 1993), we noted that "the Court in Rufo specifically limited its holding to the institutional reform setting," but we expressly reserved the question "whether Rufo entirely displaces the more rigid Swift standard."

The NLRB would have us limit Rufo to the specific problem of "the ability to alter the affirmative provisions of institutional reform consent decrees," a context in which there is a likelihood of significant changes occurring during the life of the decree. Board's Opposition Memorandum at 12 (citing Rufo, 502 U.S. at 380). It urges us to adopt the rationale of the courts of appeals of the Sixth and Federal Circuits which it reads as treating the Rufo standard as limited to institutional reform litigation. See W.L. Gore & Assoc. v. C.R. Bard, Inc., 977 F.2d 558 (Fed. Cir. 1992) (affirming a district court decision refusing to modify a consent decree that enjoined the defendant from infringing plaintiff's patent, but noting that less stringent Rufo modification standard applies to institutional consent decrees); Lorain NAACP v. Lorain Bd. of

Educ., 979 F.2d 1141, 1149 (6th Cir. 1992) (less stringent modification standard applies to institutional consent decrees because they are "fundamentally different" from private consent decrees, affect more than the rights of the immediate litigants, and present higher likelihood of significant changes due to their long life), cert. denied, 113 S. Ct. 2998 (1993).

Two other courts of appeals have stated that Rufo gave the "coup de grace" to Swift and that the Rufo standard applies to all types of injunctive relief. See United States v. Western Electric Co., 46 F.3d 1198, 1203 (D.C. Cir. 1995) (affirming modification of AT & T antitrust consent decree); In re Hendrix, 986 F.2d 195, 198 (7th Cir. 1993) (affirming modification of bankruptcy discharge). Another court has held that Rufo is not limited to litigation against a governmental entity, although it left open the question whether Rufo displaces Swift in all cases. Patterson v. Newspaper & Mail Deliverers' Union, 13 F.3d 33 (2d Cir. 1993), cert. denied, 115 S. Ct. 58 (1994).

We do not dwell upon the facts of the cases arising in the various circuits because we have now concluded, after considerable reflection, that it would be a mistake to limit the Supreme Court's decision in Rufo as the NLRB argues. Although there is language in the opinion that speaks in terms of the issues that arise in connection with institutional reform cases, those references are attributable to the fact that the Rufo case arose in that context. We deem more significant that much of the opinion represents an interpretation of the generally applicable Rule 60(b)(5) and a discussion of the equitable considerations

that courts must take into account in ruling on requests to modify injunctions. In this respect, we agree with the court's statement in Western Electric that although the Rufo Court "interspersed its . . . discussion with references to institutional reform litigation," it did so in the context of interpreting Rule 60(b)(5), which does not draw distinctions based on the nature of the litigation. 46 F.3d at 1203. But we reject Western Electric's more sweeping claim that there is no longer any place for Swift, particularly since the Supreme Court was careful in Rufo not to overrule Swift but to explain it.[1] We deem it cautious to leave to the Supreme Court the province of overruling its own decisions, particularly since we conclude that petitioners are not entitled to relief under either standard.

In many respects, we agree with the approach enunciated by the Court of Appeals for the First Circuit in Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582 (1st Cir. 1995), where the court declined to modify a consent decree entered following a commercial dispute between competing members of the same family which barred one party from using the trademarked name of the other in connection with its business. The court did not read Rufo as being confined in principle to institutional reform cases. It stated instead that "Rule 60(b)(5) sets forth the umbrella concept of 'equitable' that both

_____

[1]While Judge Becker concurs in the judgment he would follow the holdings of United States v. Western Electric Co. and In re Hendrix, Op. at 15, that Rufo governs with respect to requested modification of all types of injunctive relief.

_Swift_ and _Rufo_ apply to particular, widely disparate fact situations."  _Id._ at 586.

The court noted _Swift_'s distinction between permanent decrees and provisional or tentative decrees involving the supervision of changing conduct or conditions and stated, "_Swift_ illustrates the former and _Rufo_ the latter."  _Id._  The court saw this difference "not as a limited dualism but as polar opposites of a continuum" in which each case must be located. _Id._ In the case before it, where the decree was based on a negotiated bargain in a commercial case between private parties who had been represented by counsel, the court refused to modify the injunction and emphasized the importance of finality.  The court noted that a different approach might be appropriate when commercial cases "involve issues more laden with a public interest, such as antitrust."  _Id._ at 586 n.2.

We believe that the generally applicable rule for modifying a previously issued judgment is that set forth in Rule 60(b)(5), i.e., "that it is no longer equitable that the judgment should have prospective application."  It would be a mistake to view either _Rufo_ or _Swift_ as encapsulating a universal formula for deciding when that point has been reached.  Instead, each of those cases represents a response to a particular set of circumstances.  A court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or vacate an injunction entered by consent or otherwise.

Accordingly, the standard for modifying an injunction cannot depend on whether the case is characterized as an institutional reform case, a commercial dispute, or private or public litigation. Different considerations may have greater or lesser prominence in different cases, not because the cases are characterized one way rather than another but because equity demands a flexible response to the unique conditions of each case.

We abjure establishing a rigid, pervasively applicable rule, although it may be helpful to set forth the factors that generally should be considered in deciding whether to modify an injunction. These include the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; the length of time since entry of the injunction; whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction. Central to the court's consideration will be whether the modification is sought because changed conditions unforeseen by the parties have made compliance substantially more onerous or have made the decree unworkable. Courts which have faced similar issues also have identified as a relevant factor whether the conduct previously enjoined has become legal due to a change in the law, see, e.g., System Federation No. 91 v. Wright, 364 U.S. 642, 649-50 (1961); Gore, 977 F.2d at 561-63. On the other hand, the fact that the party is now subject to a contempt sanction for violation of the decree in addition to the statutory

punishment is not generally a factor to be considered. NLRB v. General Motors, 179 F.2d 221, 222 (2d Cir. 1950). Nor is the mere fact that the injunction is in prohibitory language rather than "mandatory" language in itself a factor that makes it resistant to modification, as the NLRB urges. See Western Electric, 46 F.3d at 1206.

Inasmuch as it is unlikely that all of the factors will tilt in one direction, the court must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction. Cf. 7 James W. Moore, Moore's Federal Practice ¶ 60.26[4], at 60-258 to 60-260 (2d ed. 1995) ("A continuing injunction may be modified when the modification would work no harm to the one for whom the injunction ran and would serve a beneficial purpose for the movant. A subsequent change in the controlling facts on which the injunction rested . . . may warrant a modification or vacation of the continuing restraint."). Finally, the court should determine whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest. In this connection, cases such as Rufo which deal with institutional reform, particularly in the context of federal courts' supervision over state institutions, require that the federal courts be sensitive to the unique federalism issues presented. See, e.g., Harris v. City of Philadelphia, 47 F.3d 1311, 1331 (3d Cir. 1995). It follows that the interest in finality of judgments may assume greater or lesser prominence according to the nature of the case and the private and public

interests implicated, but should not be either deprecated or ignored.

III.

Having sketched the general principles, we conclude that application of them to this case leads us ineluctably to resolution of the issue before us. BCTC bases its contention that it is no longer equitable for the judgments to have prospective application on the allegations in the Gillespie affidavit that it has fully complied with the decrees for the last six years and is suffering vexatious harassment and undue hardship due to the continuing existence of the decrees. We examine each contention in turn.

A.

We will assume *arguendo*, as Gillespie states in his affidavit, that from August 4, 1989 to the present "BCTC has not committed any acts nor engaged in any conduct in violation of the outstanding consent contempt adjudications and consent decree injunctions." Affidavit of Patrick Gillespie ¶ 31. However, we are unwilling to hold, and BCTC cites no persuasive authority, that the mere passage of time and temporary compliance are themselves sufficient to constitute the type of changed circumstances that warrant lifting of an injunction, and certainly not an injunction under the circumstances of this case.

BCTC relies principally on this court's affirmance of the dissolution of a permanent injunction that restrained the defendant from violating certain securities laws and regulations four years after its entry. See *SEC v. Warren*, 583 F.2d 115 (3d

Cir. 1978).  In 1973, Warren, the defendant, had consented to the entry of a decree that enjoined him from violating the margin requirements of the Securities and Exchange Act and Regulation U. In 1977 Warren moved to dissolve the injunction.  Following an evidentiary hearing, the district court made findings that approximately ten years had passed since the violation and four years since entry of the injunction, during which time the violation did not recur; the violation itself was of limited duration; and Warren suffered "personal humiliation and business embarrassment" as a result of the injunction.  Id. at 122. Moreover, an intervening change in regulations diminished the need for administrative enforcement by contempt.  On appeal, we rejected the SEC's argument that Warren had not satisfied the Swift standard, then considered the prevailing approach. Instead, we stated that Warren's "technical violation of the margin requirements . . . in no way approaches the outrageous conduct enjoined in Swift."  Warren, 583 F.2d at 121.  Unlike Swift, no great public interest was implicated, and the purpose of the injunction appeared to have been fully achieved.  In light of these circumstances, we concluded that the district court did not abuse its discretion in dissolving the injunction.

BCTC emphasizes the paragraph in Warren where we stated that in weighing the convenience of "enforcing a future violation by contempt proceedings," we must determine whether in the present circumstances "the decree works extreme and unnecessary hardship upon the defendants."  Id.  The facts before us in this case are far different than those in Warren where the defendant

committed a "single isolated offense in an esoteric area of the law," which was voluntarily corrected within six months and never repeated, and did not resist the injunction once it was entered. Id. Here, by contrast, BCTC consented to the entry of three different consent decrees over a period of nine years that reflected charges based on substantially similar conduct at different sites affecting different employers. The statutory secondary boycott provisions that BCTC was restrained from violating are neither technical nor complex. The entry of four consent contempt adjudications against BCTC in a period of seven years reflects, at the very least, repeated violations by BCTC, and in later years by its officials, of the prohibitions which it had previously voluntarily agreed to observe. BCTC's history of compliance for the last six years does not erase its history of noncompliance, as evidenced by the contempt adjudications.

BCTC also refers us to the Supreme Court's decision in Board of Educ. of Oklahoma City v. Dowell, 498 U.S. 237, 249-50 (1991), where the Court held that a school desegregation decree could be dissolved if the defendant had complied in good faith with the decree since it was entered and if the vestiges of past discrimination had been eliminated to the extent practicable. BCTC argues that Dowell permits dissolution of the decrees in this case on a showing that it has fully complied with the decrees. Otherwise, BCTC claims that it will be subject to the type of "judicial tutelage for the indefinite future" referred to in Dowell. Id. at 249.

The situation before us is hardly analogous to the school desegregation case at issue in Dowell, which presented "[c]onsiderations based on the allocation of powers within our federal system." Id. at 248. Federal supervision of local school systems was intended as a temporary measure to remedy past discrimination, and was "not intended to operate in perpetuity" or to displace local control over education beyond the extent necessary to correct a constitutional violation. Id.

Even assuming that the principles announced in Dowell extend to this case notwithstanding the unique context of school desegregation, BCTC has not shown, as the Board of Education showed in Dowell, that it has complied with the decrees since they were entered. Indeed, although it is not set forth in Gillespie's affidavit, BCTC's counsel stated at oral argument, and we fully accept his statement, that the unions have not engaged in any picketing for a large portion of the six years. There is therefore no background upon which any findings could be made that would show that BCTC has in fact learned how to picket without treading on the prohibitions against secondary boycott contained both in the law and the various negotiated consent decrees. BCTC's statement that it "has fully transformed its conduct into a model of lawful compliance," BCTC Memorandum at 5, must be evaluated in light of that decision not to picket at all. We can no more assume "lawful compliance" for six years with the secondary boycott prohibitions than we could assume a design trademark infringer had learned to produce a non-infringing product from its decision not to produce a comparable product at

all.  Under these circumstances, the mere passage of a six-year period of alleged compliance with the decrees cannot be the basis for a modification of the decrees.

                                    B.

          As a separate basis in support of its motion, BCTC contends that it has met its burden to show that there has been a change in facts sufficiently significant to warrant dissolution of the injunctions and that dissolution is suitably tailored to the changed circumstances.  In support of this argument, it argues that employers and the NLRB have used the injunctions and adjudications as a "sword of Damocles" over it, "repeatedly bringing baseless charges" of unfair labor practices, which were then withdrawn, "with the aim of harassing the Council and threatening the imposition of further fines and sanctions."  Affidavit of Patrick Gillespie ¶ 32.  In a somewhat related vein, it also contends that the compliance and recordkeeping requirements of the most recent contempt adjudication result in extreme hardship to its members because they inhibit the members' rights.

          We do not take lightly a contention that the rights of labor union members to freedom of association and expression protected by both the Constitution and federal law have been and are being repressed by decrees which this court has approved. However, it was BCTC's repeated failure to observe the decrees to which it had agreed that led to the provisions which it now claims inhibit picketing.  The Supreme Court has stated that modification of a decree is not ordinarily warranted when a party

relies on events actually anticipated at the time it entered into the decree. Rufo, 502 U.S. at 385. BCTC has not identified any significant hardship to which it and its members are subject that was unforeseen at the time it agreed to the 1989 contempt adjudication, the decree that imposes the procedure for establishing a picket line and the consequent recordkeeping that it now contends are burdensome. Nor did BCTC make any effort to propose to the NLRB even a modest modification of the particular requirements of picket line procedure which it claims in conclusory fashion are so burdensome that they warrant wholesale dissolution of the injunction. BCTC itself explains that the detailed procedure of the 1989 decree was inserted "to guard against violations of the Court's judgments." BCTC Memorandum at 4. It does not contend, as we deemed relevant in Warren, "that the decree is not properly adapted to accomplishing its purposes." 583 F.2d at 120 (quotation omitted).

While the potential for contempt fines, particularly the high fines to which it is now subject, certainly heightens the stakes for BCTC, those progressively increasing fines -- to which it agreed -- were raised to their present level only after the earlier less severe sanctions proved ineffective. Therefore, we need not decide the equity vel non of including a prospective noncompliance fine at the outset, see Blankenship & Assoc. v. NLRB, 54 F.3d 447, 449 (7th Cir. 1995), particularly because these fines accrue with each day of continuing violations. See id. at 450. Moreover, any attempt at a contempt adjudication, even on the basis of a stipulated fine, would entitle BCTC and

those subject to the order to judicial overview.  See, e.g., Harris, 47 F.3d at 1321-25.  We have no question that the courts will be able to distinguish between intentional violations of the decrees and unjustified harassment by what BCTC denominates as "vicious anti-labor law firms and employers."  BCTC Memorandum at 10.  The few instances referred to in the Gillespie affidavit do not support a claim of unfair or unwarranted wholesale harassment.

Nothing shown by BCTC approaches the type of changed circumstances which we held justified a modification in Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114 (3d Cir. 1979), cert. denied, 444 U.S. 1026 (1980).  In that case, after Pennsylvania agreed in a consent decree to provide certain medical services to a specified number of welfare recipients by a date certain, it moved to vacate or modify the decree, contending that it had attempted good faith compliance with the numerical requirements but fell short because eligible recipients refused services or failed to show for appointments and because of a shortage of participating physicians and dentists.  It introduced evidence that it had committed substantial resources to complying with the decree and that the total population eligible for services was significantly lower than that expected at the time of the decree due to declining welfare rolls.

We affirmed the district court's order eliminating the numerical requirement, noting that this requirement had proven impossible of performance due to circumstances beyond the defendants' control and not contemplated by the court or the

parties at the time of the decree.  We held that where an affirmative obligation is imposed on the assumption that it is realistically achievable and defendants have made a good faith effort to comply, but compliance has not been achieved, "a court of equity has power to modify the injunction in light of experience."  Id. at 1120-21.

In this case, BCTC has made no showing that changed circumstances have made adherence to the compliance procedure substantially more onerous or have made the compliance procedure unworkable.

## IV.

For the foregoing reasons, we will deny BCTC's motion to dissolve the consent judgments and vacate the consent contempt adjudications.