**James BENJAMIN, et al., Plaintiffs,**

v.

**Michael P. JACOBSON, et al., Defendants,**

**And related cases.**

No. 75 Civ. 3073 (HB).

United States District Court, S.D. New York.

April 15, 1996.

---

518

Daniel L. Greenberg, John Boston, Marta Nelson, John A. Beck, Sarah Kerr, The Le-

gal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs.

Paul A. Crotty, Corporation Counsel of the City of New York, Lorna B. Goodman, June R. Buch, Laura A. Chamberlain, Florence A. Hutner, of Counsel, New York City, for defendants.

### OPINION AND ORDER

BAER, District Judge:

Defendants have moved for a temporary suspension of Paragraph U of the Consent Decrees in this action relating to the provision of law library services to inmates in the Central Punitive Segregation Unit ("CPSU") on Rikers Island. I reserved decision on this motion pending receipt of records of infractions at the CPSU library and other submissions by the parties. So far, since the CPSU was moved to the Otis Bantum Correctional Center ("OBCC") on March 9–10, 1996, there have already been eleven infractions either at the congregate library or en route to or from the library. Several of the incidents have been brutal slashings and beatings that have sent both inmates and correction officers to the hospital for treatment. I now find it is clearly in the public interest to stop this violence. Accordingly, defendants' motion is granted.

### I. Background

This motion for temporary suspension of the law library provisions is part of a larger motion brought by defendants to seek relief from several of the provisions of the Consent Decrees. The CPSU law library issue was singled out for expedited consideration in an effort to resolve the problem before the segregated inmates were moved to OBCC. *See* Declaration of Lorna B. Goodman dated March 20, 1996 ¶ 5. Because the motion was not decided by March 9, the defendants have been providing law library services in a congregate facility as mandated by the current Consent Decrees. *See id.* ¶ 4.

This motion was made originally based on a record of violence associated with the CPSU law library services. When the defendants first moved for this modification they stated:

> In the first nine months of 1995, 11 CPSU inmates were slashed or stabbed in sepa-

rate incidents during law library sessions, or during transport to or from such sessions. During that same period, 23 CPSU inmates were found guilty of 26 charges of either assaulting or fighting with staff or other inmates during law library sessions or while travelling to or from the law library. Numerous others were found guilty of carrying contraband weapons or of disrupting law library services by boisterous or threatening behavior.

Def.Mem. at 50 n. 58. In response, plaintiffs argued that the move to OBCC, where inmates with a history of violent infractions would be held in rooms outside of the congregate library area, could potentially reduce the level of violence. Pl.Mem. at 36. I agreed with this logic and decided to give the new facility a thirty day test period. I have seen enough.

As this section will detail, since March 9 the violence, which plaintiffs suggested would subside, has escalated dramatically. Rather than wait the thirty days, I called the parties in on April 11, 1996 to discuss what had transpired. I set this forth in some detail to demonstrate that in my view there has been an unacceptable amount of violence.

On March 12, several inmates [1] were involved in an altercation while travelling from the law library to their cells. The incident started when the inmates charged another inmate working at the OBCC. One inmate removed his handcuffs and hit a corrections officer with them, fracturing his nose. The staff on hand as well as two probe teams in riot gear were required to restrain the inmates. In the end, approximately ten correction staff were injured and the inmate also required medical attention. *See* Supplemental Declaration of Deputy Warden Clyton Eastmond dated March 28, 1996 ¶ 4 ("Eastmond Decl."). On March 19, one inmate assaulted another while inside the congregate area of the law library. The first inmate had been released from his handcuffs and punched the other, who was still restrained, several times in the face. *See id.* ¶ 5.

Two slashings occurred on March 20 in the congregate library. In the first, an inmate

---

1. The exact number of inmates is disputed. Defendants contend that seven were involved, but the plaintiffs note that infraction reports were filed for only five inmates. *Compare* Supplemen-

tal Declaration of Deputy Warden Clyton Eastmond dated March 28, 1996 ¶ 2 with Supplemental Declaration of Sarah Kerr dated April 9, 1996 ¶ 23.

sustained lacerations to his ear, neck and scalp and required medical attention. *See id.* ¶ 6. In the second, one inmate cut another on the face with an unknown weapon leaving a gash that required sutures. Another inmate also punched the victim. *See id.* ¶ 7; Supplemental Declaration of Sarah Kerr dated April 9, 1996, at ¶ 27 ("Kerr Decl.").

There were also two incidents on March 23. In the first, two inmates attacked a third in the congregate library area. While one restrained the victim, the other slashed him. *See* Eastmond Decl. ¶ 8. Approximately fifteen minutes after the first incident, as the inmates were walking to their cells, five inmates became "uncooperative and unruly." The correction staff was required to push the inmates towards their housing area. As a result of the incident, four corrections officers were injured, two requiring medical attention. *See id.* ¶ 9.

On March 28, an inmate refused to be handcuffed and resisted the correction staff. *See* Kerr Supp.Decl., at ¶ 31. On March 29, another inmate acted in "a hostile manner" during a search and a corrections officer sprayed him with a chemical agent in order to restrain him. *See id.* ¶ 32. While these last incidents were relatively minor, it is important to remember that the staff facing such resistance does not know if the incident will escalate and must react accordingly. Such disturbances can only add to the physical and emotional stress endured by the correction staff. *See* Eastmond Decl., at ¶ 11.

Also on March 29, an inmate slashed another inmate in the law library with a nail. The injured inmate suffered cuts on his ear, scalp and hand. *See* Supplemental Declaration of Lorna B. Goodman dated April 11, 1996, Ex. B. Finally, on April 9, there were two more incidents. In the first, an inmate assaulted a corrections officer as he was being led out of the library in handcuffs. *See id.* ¶ 2. The inmate verbally abused the officer, pushed him against the wall and kicked him in the thigh. In response, the officer punched the inmate in the face. *See id.* Ex. A. In the second incident, an inmate slashed another with a double edged razor, cutting his jaw. The injured inmate was sent to the hospital for treatment. *See id.* ¶ 2.

Although it is clear that the inmates are responsible for their violent acts, the record also indicates that the security procedures at the OBCC were less than perfect. It appears, however, that improvements are being made. For example, Deputy Warden Eastmond states that he has assigned correction officers to the inside of the congregate library area, rather than stationing them outside of the wire mesh screen. Eastmond Decl. ¶ 10. In addition, Sarah Kerr states that inmates have told her that the process of uncuffing inmates has been modified so that handcuffed inmates are no longer mingled with uncuffed inmates. Kerr Decl. at ¶ 18. Nevertheless, it is equally apparent that these adjustments are too little too late. As detailed above, in the month since the inmates moved to the OBCC, there have been four slashings, four assaults and three incidents involving threatening or uncooperative behavior. Both parties agreed at the oral hearing on April 11 that this level of violence is unacceptable.

## II. Discussion

■ Although defendants' motion was originally based on the theory that they were in substantial compliance with the Consent Decrees and therefore were entitled to complete vacatur of Paragraph U, in light of the recent incidents of violence, the focus of the motion has changed. In this Opinion, I will address the propriety of granting a temporary suspension of Paragraph U based on the changed conditions in the CPSU. The parties will be free to revisit the issue of substantial compliance when the main motion for vacatur is submitted later this summer since counsel for plaintiffs believes some accommodations may be accomplished. In addition, although I now conclude that the defendants' preliminary proposal satisfies constitutional requirements, in practice the program may not afford adequate access to the courts. *See Walters v. Edgar,* 900 F.Supp. 197 (N.D.Ill. 1995). Accordingly, plaintiffs will also have a chance to argue that the details of the in cell service plan are unconstitutional. I see no reason, however, to allow the current level of violence to continue unabated.

Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, a party may seek relief from a consent decree when "it is no longer equitable that the judgment should have prospective application." In *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 380, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992), the Supreme Court held that Rule 60(b) codifies a flexible standard. The essence of the *Rufo* decision is that district courts must exercise their equitable powers and discretion in reviewing motions to modify consent decrees. *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir.1995) ("*Rufo* teaches that the power of a court to modify or terminate a consent decree is, at bottom, guided by equitable considerations."); *Building and Construction Trades Council v. NLRB*, 64 F.3d 880, 888 (3d Cir. 1995) ("A court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or vacate an injunction entered by consent or otherwise."). Furthermore, as Judge Friendly wrote, "[t]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *New York State Association For Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir.) (*quoted in Rufo*, 502 U.S. at 382 n. 6, 112 S.Ct. at 771 n. 6), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).

Under *Rufo*, "a party seeking modification of a consent decree bears the initial burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances." 502 U.S. at 383, 112 S.Ct. at 760. A party can satisfy the first prong of the *Rufo* test by "showing a significant change in factual conditions or in law." *Id.* at 384, 112 S.Ct. at 760. As the Third Circuit recently summarized, "[m]odification may be appropriate when changed factual conditions make compliance with the decree substantially more onerous, when a decree becomes unworkable because of unforeseen obstacles, or when enforcement of the unmodified decree would be detrimental to the public interest. However, modification

should not ordinarily be granted 'where a party relies on events that actually were anticipated at the time it entered into a decree.'" *Building and Construction Trades Council*, 64 F.3d at 886 (citation to *Rufo* omitted).

The recent rash of violence at the OBCC meets all of the possible factual situations discussed in *Rufo*. First, the violence makes the Consent Decrees more onerous and unworkable because it creates such a hostile atmosphere in the jail that it is difficult for the prison staff adequately to control the inmates. Although jails, and punitive segregation units in particular, are not stress free environments, the load placed on the system here is unacceptable. *See* Eastmond Decl. at ¶ 11 ("My staff and I have been working double shifts to address the difficulties of dealing with such a violent population, but this relentless pace is extremely wearing, both physically and emotionally, and should not be maintained.").

Second, and more importantly, maintaining the current system of providing a congregate law library to CPSU inmates is not in the public interest. Inmates have a right to obtain legal materials in a safe environment. In addition, the correction staff has a right to be protected from inmate violence. Finally, the public has a significant interest in halting the rampant lawlessness at the OBCC. As a court of equity, I will not sit idly by while inmates are slashed and corrections officers assaulted.

Plaintiffs argue that the level of violence at the jail cannot be considered a change in factual circumstances under *Rufo* because the original consent decrees were negotiated in part to deal with the issue of violent infractions. Pl.Mem. at 34. In addition, plaintiffs claim that the violence would be reduced if the defendants would apply their existing security rules more effectively and uniformly. *Id.* at 34–35. Finally, even the recent events have not completely changed plaintiffs' views. While they now concede that "there is currently an unacceptable level of violence in the CPSU," Kerr Decl. ¶ 38, plaintiffs maintained at the April 11 hearing that the proper course is renegotiation or

implementation of a pilot program pursuant to the existing Consent Decrees. Judicial modification, plaintiffs claim, is still not appropriate.

I must reject plaintiffs' position. Taken to its logical extreme, under plaintiffs' interpretation of *Rufo,* no issue that was contemplated at the time a consent decree was entered into could ever be considered in determining whether there had been a change in circumstances. Thus, even if there were regular and extended riots at the CPSU law library, this Court would under plaintiffs' analysis be barred from considering modification. Such an interpretation is patently inconsistent with the emphasis in *Rufo* and its progeny on the Court's equitable powers. In addition, the correct inquiry under *Rufo* is not whether the general problem of prison violence was considered, but whether the claimed change in factual circumstances was actually "anticipated." I conclude that the current level of violence was not anticipated. Accordingly, it constitutes a change in factual circumstance warranting temporary modification of the Consent Decrees.

The second prong of the *Rufo* analysis looks to whether the proposed modifications are "suitably tailored" to address the problems created by the changed circumstances. Under *Rufo,* modifications to consent decrees may not create constitutional violations or rewrite the specifications to the constitutional floor. *Rufo,* 502 U.S. at 391, 112 S.Ct. at 763–64. Within that boundary, however, the district court must defer to local government officials based on principles of federalism. *See id.* at 391, 391 n. 14, 112 S.Ct. at 763–64, 764 n. 14.

Defendants propose to provide inmates with law library services in their cells. Inmates will be able to speak by telephone with the library coordinator to obtain assistance with their research or, if that is not necessary, may request materials in writing. The materials requested by inmates will be provided either on the same day or the following day. *See* Def.Mem. at 51 & n. 61.

Plaintiffs first argue against the defendants' proposal because it "is not narrowly tailored to deal with the unacceptable level of violence." Kerr Decl. ¶ 39. Narrow tailor-

ing, however, is plainly not required. In addition to the fact that *Rufo* speaks only of suitable tailoring, a narrowly tailored requirement is at odds with the rationale of the *Rufo* decision. Narrow tailoring, and its cousin least restrictive means analysis, are strict standards. They have no place in the flexible approach established in *Rufo.*

Next, plaintiffs argue that this proposal will be unduly burdensome to the inmates. They contend that the system will be fraught with delays and inefficiencies that are not necessary to respond to the violence in the congregate law library.

■■■ The right at stake here is the prisoners' right of access to the courts. This constitutional right is well-established, *see Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), but the courts have not yet devised a bright line rule for determining what kind of particular prison library system provides for adequate access to the courts. *See Abdul–Akbar v. Watson,* 4 F.3d 195, 204 (3d Cir.1993). It is clear, however, that the State must provide prisoners with sufficient access to legal materials and/or advice such that the prisoners may identify the relevant legal authorities and present them in a meaningful and intelligible manner. *See Eason v. Thaler,* 73 F.3d 1322, 1328 (5th Cir.1996); *Abdul–Akbar,* 4 F.3d at 203. Thus the right guarantees meaningful access to legal materials rather than physical access to a law library. *See Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495–96 (" '[M]eaningful access' to the courts is the touchstone.") (alteration in original). Restrictions on access to the courts violate the Constitution or approach the constitutional floor when they become unreasonable barriers. As the Second Circuit stated in a challenge to a prison restriction on free postage, "[t]he question here is whether the restrictions imposed by the State's Directive are reasonable." *Chandler v. Coughlin,* 763 F.2d 110, 114 (2d Cir.1985).

■■■ The defendants' proposal is acceptable under *Rufo.* The defendants' security concerns are a legitimate justification for imposing limitations on access to a library. *See Eason,* 73 F.3d at 1328; *Campbell v.*

*Miller,* 787 F.2d 217, 226–230 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). In addition, mere delays in obtaining legal materials do not rise to the level of a constitutional violation. *See Campbell,* 787 F.2d at 228–229; *Tellier v. Scott,* No. 94 Civ. 8026 (LLS), 1996 WL 140316 (S.D.N.Y. March 28, 1996). Accordingly, showing the mandated deference to the defendants' administrative expertise, I conclude that the proposal is a suitably tailored response to the unacceptable level of violence at the CPSU law library.

### III. Conclusion

For the foregoing reasons, defendants' motion for temporary modification of the CPSU law library provisions of the Consent Decrees is granted. This constitutes the Decision and Order of the Court. A more detailed order with respect to the provision of law library services may be submitted by either party on notice to the other.

SO ORDERED.