UNITED STATES of America, Plaintiff,

v.

KAYSER–ROTH CORPORATION
and Hydro–Manufacturing,
Inc., Defendants.

C.A. No. 88–0325B.

United States District Court,
D. Rhode Island.

March 14, 1996.

Cynthia S. Huber, Senior Attorney, Environmental Enforcement Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, Lois J. Schiffer, Ass. Attorney General, Environment and Natural Resources Division, Washington, DC, Sheldon Whitehouse, United States Attorney, District of Rhode Island, Providence, RI, Everett Sammartino, Ass. United States Attorney, District of Rhode Island, Providence, RI, for Plaintiff.

Deming E. Sherman, Edwards & Angell, Providence, RI, for Defendant Kayser–Roth Corp.

Haig Barsamian, Providence, RI, William G. Grande, Jr., Providence, RI, for Defendant Hydro–Manufacturing, Inc.

## MEMORANDUM AND ORDER

FRANCIS J. BOYLE, Senior District Judge.

Pursuant to Federal Rule of Civil Procedure 60(b), Hydro–Manufacturing, Inc. ("Hydro") filed a Motion to Vacate or Modify the Consent Decree entered into on January 18, 1990. Hydro argues that the Decree should be altered or vacated because of circumstances which are unfairly burdensome. Based upon recent First Circuit law and principles of equity, Defendant's Motion is denied.

## I. Background

### A. The Initial Contamination and Previous Litigation

This matter commenced years ago under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1995), when the United States entered into a Consent Decree with Hydro and litigated successfully against Kayser–Roth Corporation ("Kayser") in response to pollution at Stamina Mills.

The Stamina Mills Superfund site is located 14 miles north of Providence, Rhode Island, in the town of North Smithfield, on the Branch River. Contamination of the river and surrounding residential water wells occurred in March 1969 when trichlorethylene ("TCE") escaped as it was improperly pumped into storage tanks. At that time, Stamina Mills was a textile manufacturing company owned by a subsidiary corporation of Kayser. Because it was the owner at the time of the pollution, the Court found Kayser liable for the release of hazardous-materials, under 42 U.S.C. § 9607(a)(2).

Hydro purchased the site in March of 1981 and thereby, as an owner, became liable for response costs incurred, and to be incurred, according to § 9607(a)(1) of CERCLA. Rather than litigate liability, Hydro and the United States agreed to settle. The Consent Decree was first submitted in 1989, further negotiations then took place, and a final Decree was entered in January of 1990.

For a fuller expose of the facts, the reader should refer to United States v. Kayser–Roth Corp., 724 F.Supp. 15 (D.R.I.1989), aff'd., 910 F.2d 24 (1st Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991) and Hydro–Manufacturing, Inc. v. Kayser–Roth Corp., 903 F.Supp. 273 (D.R.I.1995).

### B. The Consent Decree

Under the terms of the Decree, Hydro retains legal title to the property, pays real estate and sewer assessment taxes to the Town of North Smithfield until the site is remedied, at which point, Hydro must sell the land and pay the proceeds to the United States.[1] However, should Hydro find an acceptable buyer, it need not wait for clean-up completion before selling the property. In exchange, Hydro received a covenant not to sue under § 107 of CERCLA and contribution protection pursuant to § 113 of CERCLA. Hydro now seeks to vacate the Consent Decree entirely. In the alternative, Hydro proposes a new decree which provides that if Kayser fails to pay the cost of clean-up, Hydro will either forfeit the net proceeds from a sale of the property, or pay the market value of the property to the government.

Hydro argues that under Fed.R.Civ.P. 60(b)(5) or (6), a Consent Decree may be vacated or modified by the court. Hydro contends that because Kayser has been found to be the uncontroverted contaminator of the site, and Hydro is simply an innocent land-owner, the Decree is no longer equitable. Furthermore, the pollution cleanup will take longer than reasonably anticipated, so the obligation to pay municipal taxes for an additional ten to twenty years would be an undue hardship on Hydro. The issue is

1. Since the Decree's filing, Hydro has not paid property taxes and sewer assessments because of alleged on-going negotiations with the town for a complete abatement of municipal costs.

whether these two arguments warrant modification or vacation of the Consent Decree.

## II. Discussion

### A. Legal Standards for Consent Decree Modification

Rule 60(b) of the Fed.R.Civ.P. does not set forth the exact circumstances when a decree may be changed. The relevant provision allows alteration if: "(5) the judgement has been satisfied, released, or discharged, reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(5) and (6). In the absence of any codified standards, guidance may be found in case law.

### B. Supreme Court Precedent

In 1932 the Supreme Court wrote that a movant must make "a clear showing of grievous wrong" in order to modify a consent decree. *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). In *Swift* the Court resolved a longstanding antitrust dispute between the government and the meat-packing industry. In the decree the meat-packers agreed not to manufacture, sell or transport various food products. *Id.* at 111, 52 S.Ct. at 461. Ten years later, the meat-packers argued the industry had changed such that the restraints of the decree's injunction "were now useless and oppressive." *Id.* at 113, 52 S.Ct. at 462. The Court reaffirmed that a court of equity retains the power to modify an injunction in adaptation to changed circumstances. *Id.* at 114, 52 S.Ct. at 462; *See also In re Pearson*, 990 F.2d 653, 658 (1st Cir.1993). However, the Court refused to vacate the order and held that, "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. at 464.

Almost sixty years later, the Supreme Court revisited the issue of consent decrees and possible modification, although in a different context. This time the Court examined a district court's order to dissolve an injunction which enforced a school desegregation order in Oklahoma City. *Board of Education of Okl. City Public Schools v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). Here, the Court declined to utilize the strict *Swift* standard, rather, the Court held that the school board must simply show that it was operating consistently with the Equal Protection Clause of the Fourteenth Amendment and it was unlikely for the discrimination to reoccur. *Id.* at 247, 111 S.Ct. at 636–37. The consent decree could be lifted because the aim of the desegregation litigation had been met. *Id.*, citing *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968).

In *Dowell* the Court went to great lengths to explain that the *Swift* standard was inapplicable because under principles of federalism school desegregation orders could not exist in perpetuity. The Court held that federal regulatory control, implemented by a decree, should only last until the discrimination is eliminated. *Dowell*, 498 U.S. at 248, 111 S.Ct. at 637. Ultimately, local communities should control the education of their children, not courts. *Id.*

In a case decided the following year, the Supreme Court refined this more relaxed standard for decree modification when in the arena of public institutional reform. In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), a decree provided that a new jail be built in order to prevent the double bunking of pre-trial detainees. The county sheriff filed a motion to modify the decree during the prison construction. The district court denied the motion and the First Circuit affirmed. The Supreme Court again refused to use the *Swift* standard, and instead held that a movant "bears the burden of establishing that a significant change in circumstances warrants revision of the decree ... the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383, 112 S.Ct. at 760. The Court noted that the increase of institutional reform litigation has made it more crucial that a district court be able to modify a

decree in response to changed circumstances. *Id.* at 380, 112 S.Ct. at 758. Yet, the Court cautioned that modification is not justified when a decree simply becomes inconvenient for a party. *Id.* at 383, 112 S.Ct. at 760.

### C. First Circuit Case Law

Recently, the First Circuit had an opportunity to decide if a decree enjoining the use of a trademark between two wine-trading companies should be changed. In that case, *Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.*, 45 F.3d 582 (1st Cir. 1995), the court navigated between the two seemingly different Supreme Court modification standards.[2] The First Circuit held the two standards should not be viewed as "a limited dualism but as polar opposites of a continuum in which we must locate the instant case." *Id.* at 586.

■ The First Circuit's analysis avoids strict classification of a case to determine the applicable standard. The Court declined to rule that there is an institutional reform exception to *Swift* or a private party exception to *Rufo*. *Id.* at 586. Thus, we need not decide whether the decree between Hydro and the government is solely a private, permanent contract and thus, warranting the *Swift* standard. Nor must the court find that the public service ramifications of the decree suggest that the more relaxed *Rufo* standard should be employed.

Instead of wrestling with that task, the First Circuit directed that decree modification should be allowed upon consideration of the following factors, "the circumstances leading to the decree (including the nature of a party's wrongdoing), the quantum of hardship on the burdened party, the duration of the burden thus far and the prospect of it continuing, and the benefitted party's need for a continuation of a decree." *Id.*

The First Circuit's approach was endorsed by the Third Circuit when it was faced with a motion to dissolve consent judgments between a union and the NLRB. *Building and Const. Trades v. NLRB*, 64 F.3d 880, 887 (3rd Cir.1995). The court noted that the Sixth and Federal Circuits treat the *Rufo* standard as limited to institutional reform. *Id.* at 886, *citing W.L. Gore & Assoc. Inc. v. C.R. Bard, Inc.*, 977 F.2d 558 (Fed.Cir.1992); *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1149 (6th Cir.1992), *cert. denied*, 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993). In contrast, the Seventh and District of Columbia Circuits have held that *Rufo* applies to all types of injunctive relief. *Id.* at 887, *citing United States v. Western Electric Co.*, 46 F.3d 1198, 1203 (D.C.Cir.1995); *In re Hendrix*, 986 F.2d 195, 198 (7th Cir.1993). Rather than choose a rigid standard, the Third Circuit decided the case based on factors similar to those enunciated by the First Circuit in *Lichine*. *Id.* at 888.

The Third Circuit observed, "the standard for modifying cannot depend on whether the case is characterized as an institutional reform case, a commercial dispute, or private or public litigation ... equity demands a flexible response to the unique conditions of each case." *Building and Construction Trades*, 64 F.3d at 888.

This Court is mindful that the First Circuit in *Lichine* footnoted the observation that, "a different approach might be more appropriate when such cases involve issues more laden with a public interest, such as antitrust." *Lichine*, 45 F.3d at 586, n. 2. Certainly, the government is acting as public protector when it attends to pollution sites and enforces the provisions of CERCLA, which is not unlike the government's role of enforcing antitrust provisions of the Sherman Act.

---

**2.** Out of the ten First Circuit cases which refers to either the *Rufo* or *Dowell* opinions, this is the only case which does not involve institutional reform or the vindication of constitutional rights. *See i.e., King v. Greenblatt*, 52 F.3d 1, 4 (1st Cir.1995) (*Rufo* standard used in consideration of motion to modify decree correcting unconstitutional conduct at state-run treatment center), *cert. denied*, —— U.S. ——, 116 S.Ct. 175, 133

L.Ed.2d 115 (1995); *Consumer Advisory Bd. v. Glover*, 989 F.2d 65, 67 (1st Cir.1993) (*Dowell* standard applied to enforce improvements to state institution for the mentally retarded); *Mackin v. City of Boston*, 969 F.2d 1273, 1275 (1st Cir.1992) (*Rufo* standard applied to consent decree requiring more minority representation in Boston Fire Department), *cert. denied*, 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993).

Yet, the decree between the government and Hydro is essentially a deal in which cash is exchanged for circumventing expensive litigation. The government acts as a short-term lender, financing the pollution clean-up and then seeking reimbursement. The Decree does not require temporary judicial oversight. The decree, like any contract, expires once the exchange takes place. Like the commercial litigation at issue in *Lichine*, both Hydro and government were represented by counsel, and voluntarily entered into the decree. For those reasons, Hydro's motion will be considered by applying the First Circuit's factors listed in *Lichine*.

### D. Application of the Lichine Factors

The next step to be taken is application of the First Circuit's factors to the particulars of the dispute between Hydro and the government.

#### 1. Circumstances Leading to the Decree (including nature of the party's initial wrongdoing)

Hydro argues that circumstances which have arisen after the Decree warrants its retraction, not those circumstances prior to the decree. There is no indication that the Decree was signed under dubious or misleading conditions. Hydro argues that since the Decree, Kayser has been found to be the sole pollutant and ordered to participate in the clean-up effort. Hydro has always maintained the status of an innocent landowner and blameless for the contamination.

Hydro had the opportunity to litigate its liability before joining into the decree. Perhaps it could have presented an "innocent landowner" defense to liability, pursuant to § 9601(35)(A) and (B) of CERCLA. However, this did not occur and for better or for worse, Hydro essentially conceded strict liability when it agreed to the decree.[3] This Motion cannot serve as a vehicle to circumvent the relevant statute of limitations and litigate whether Hydro can claim a complete defense to CERCLA liability.

In addition, contemporaneous with the Decree's enactment, Hydro should have been aware that a past owner of the site could also be held liable, according to § 9607(a)(2) of CERCLA. Indeed, CERCLA encourages a clean-up to be a collaborative effort because it assigns liability to a whole host of actors, such as past owners, present owners or waste transporters. 42 U.S.C. § 9607(a)(2) and (3). Any amount the government recovers from Kayser is reduced by the value of its settlement with Hydro. 42 U.S.C. § 9613(f)(2). Thus, it is not as if the government will reap a windfall from the dual contribution of Kayser and Hydro.

Even if Hydro were unaware of CERCLA's liability provisions, the Decree was signed shortly before the United States and Kayser went to trial. By all indicators, Hydro could have, and should have, been aware of Kayser's potential liability. Kayser's past and present involvement is not a circumstance which weighs in favor of modifying the decree.

#### 2. Quantum of Hardship on the Burdened Party

Hydro contends that the proposed clean-up of Stamina Mills is taking longer than anticipated and therefore, the obligation to pay municipal costs for years on end (ten to twenty years according to Hydro) is too burdensome. Hydro asserts that Stamina Mills is the corporation's only asset and since purchase, the corporation has been unable to maintain any income-generating activity on the site. Meanwhile, Hydro is responsible for real estate taxes and sewer assessment fees.

The figures do indicate that the property value of Stamina Mills has dropped sharply. The assessed value of the land in 1993 was $21,500, while after 1993, the assessed value was reduced to $4,700. At the time of settlement, the corporation had the site as its only asset. The settlement included the shareholders in the government's covenant not to sue which indicates that the shareholders might have been exposed to liability. There-

---

**3.** This Court recently acknowledged Hydro's probable liability to the United States when granting Kayser's Motion to Dismiss in a related lawsuit. *See Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 903 F.Supp. 273, 276 (D.R.I. 1995).

fore, at the Decree's inception, Hydro was fully aware of its financial assets and future financial commitment.

Hydro's argument that the municipal fees are too great appear a bit disingenuous, since the company has yet to pay the town of North Smithfield anything. Possibly, the town of North Smithfield may grant Hydro a complete abatement of municipal costs. It is unlikely that the Town will seek to collect taxes due by a forced sale of the property because given the circumstances, the property is essentially unmarketable. Should Hydro begin to pay the town, the costs are relatively low. The current total of taxes due since July of 1989 is approximately $2,519.12, plus penalties.

In 1979 or 1980 the property was subject to a sewer assessment of $9,752.00, requiring an annual payment of $634.66 per year ($120.57 in principle and $514.09 in interest). The last payment was apparently made in 1987 for $151.03. Currently, the total sewer assessment due since July of 1989, is approximately $4,291.59, plus penalties. The sewer assessment would have been paid off in about 1990, had Hydro made timely payments. Yet, like the real estate taxes, Hydro has not made payment. In sum, these municipal costs do not impose unfair or particularly onerous hardships on Hydro.

### 3. Duration of the Burden

At the time of the Decree negotiations both parties knew that soil and groundwater treatment· was necessary and time-consuming. A remedial plan for Stamina Mills was first proposed in September 1990 in the Record of Decision ("ROD"). This included plans to cleanup the source of the pollution in the soil and control the migration of contamination. According to the government, remedial design should be completed by the fall of 1996. After approval of the remedial design, construction of treatment systems should be completed in six to eight months. The soil cleanup should take two years after the completion of construction. The groundwater treatment should operate for five to ten years.

Clearly, the rehabilitation process is long and no one can predict with total accuracy the exact date of completion. Hydro knew that this was the situation at the time it entered into the Decree. Moreover, since the ROD submission there has been no new evidence that the target dates are wildly inaccurate, or that the contamination is more expansive than originally determined. The possible longevity of the Decree does seem indeterminate, yet, that uncertainty is mitigated by the fact that the costs of remaining a party to the Decree are slight.

### 4. Benefitted Party's Need for Continuation of Decree

The government and the public have a strong need for the Decree to remain intact as is. The aim of CERCLA is to clean up dangerous pollution as effectively and efficiently as possible. Part of the effort includes imposing liability on past owners and utilizing a decree to enforce legal responsibilities. The important purpose of CERCLA would be thwarted were the Court to change the Decree based upon Hydro's grievances.

Furthermore, the wider principle of judicial finality is served when the court upholds a decree. The decisions in *Swift*, *Rufo* and *Lichine* demonstrate that finality should not be maintained at all costs. But in this particular case, the government cannot continue effective litigation against perpetrators of pollution, if it is perceived that decrees are neither final, nor binding. In addition, vacating the decree would waste valuable financial and time resources because the matter would be returned to its pre-settlement state and the parties would began preparation for trial.

### III. Conclusion

After applying the facts to the *Lichine* analysis, it is clear that Hydro has found it somewhat economically inconvenient to operate within the terms of the Consent Decree it voluntarily entered into in January of 1990. This is the exact situation which the Supreme Court warned did not warrant modifying a decree in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383, 112 S.Ct. 748, 759–60, 116 L.Ed.2d 867 (1992).

■ Examination of the circumstances leading up to the Decree demonstrate the Hydro was fully cognizant, or could have been, of that which it now complains of, i.e., Kayser's liability and the clean-up process. The hardship imposed on Hydro is a small financial expenditure, which it has not to this date paid. Granted the Decree may be in place for a long time, but the uncertain duration is offset by the minimal hardship. In addition, the benefits conferred by the Decree to the public and the government's continued enforcement of CERCLA also weigh in favor of keeping the Decree.

While it is unfortunate that Hydro initially saddled itself with contaminated property, it choose to respond by entering into the Decree. There are no new or unforeseeable conditions which warrant vacating or altering the Decree. Plaintiff's Motion to Modify or Vacate the Consent Decree is denied.

**IT IS SO ORDERED.**